[No. D004696. Fourth Dist., Div. One. Nov. 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
DON V. HARBOLT, Defendant and Appellant.

[Nos. D007610, D007933. Fourth Dist., Div. One. Nov. 28, 1988.]

In re DON V. HARBOLT on Habeas Corpus.

COUNSEL

Fiedler & Gardner and Cliff Gardner for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janelle B. Davis and Nancy L. Palmieri, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**TODD, J.**—A jury convicted Don V. Harbolt of possession of a fictitious bill, note or check (Pen. Code,[1] § 476), possession of stolen credit cards (§ 484e, subd. (2)), and grand theft of an automobile (§ 487, subd. 3). Additionally, the trial court found true allegations of six prior prison terms and ruled they constituted a total of three prior prison terms for purpose of enhancements (§ 667.5, subd. (b)). The trial court sentenced Harbolt to a total of seven years and four months in prison, selecting a base term of three

[1] All statutory references are to the Penal Code unless otherwise specified.

years on the section 476 count and consecutive terms of eight months on each of the other two counts as well as consecutive one-year terms on each of the three-prior-prison term enhancements.

In this consolidated appeal and petition for habeas corpus, Harbolt, a jailhouse lawyer who represented himself at the trial, raises as his principal assignment of error that his decision to waive counsel at trial was not knowing and intelligent because after the information was amended he did not know the penal consequences of conviction. He also contends the prosecutor committed misconduct by intimidating a defense witness, the trial court was biased, and the trial court erred in imposing a one-year enhancement because Harbolt did not serve a one-year prison term on his prior offense.

## Facts

On October 23, 1985, a man identifying himself as Mr. Gonzales attempted to cash a $750 money order at The Check Cashing Place. The manager, recognizing the money order was bogus, called the police. Gonzales told the responding police officer he had received the money order from two men in a car. The officer radioed a description of the vehicle and its occupants. Officer Deloach stopped a car matching the description and the occupants identified themselves as Mr. McMillan and Mr. Blaylock. McMillan told Deloach a friend living in a hotel in La Mesa had given him the money order. Deloach, two detectives and McMillan drove to the All Star Inn in La Mesa, where McMillan directed the officers to room 221. There was a note on the door that read, "Be back in twenty minutes." The officers waited and in about 20 minutes Harbolt arrived and entered the room. The detectives, identifying themselves as police officers, knocked on the door and Harbolt opened the door. Harbolt identified himself as Doug Schultz, but refused to show identification. The officers placed Harbolt under arrest.

During a patdown search, the officers found keys to a van, which had been described by McMillan and which contained several briefcases. The briefcases contained paper, stubs of money orders, razor blades, white out, cut-ups of logos, laminating paper, paper mock-ups of cashier check money express orders, Harbolt's birth certificate, identification cards with Harbolt's picture and other individuals' names and credit cards.

Expert witness Charles Principe testified the bogus money order was made from documents found in one of the briefcases. Officer Victor Colvin of the San Diego Police Department's forgery unit testified much of the material in the van was useful in forging documents.

Harbolt, using the name of Bill Young of Dallas, Texas, had rented the van for two days on September 23, 1985, in Oklahoma City, Oklahoma. Harbolt paid for the rental with a bogus money order and Mastercard in Bill Young's name, which was later discovered to have been stolen. William Young of Dallas, Texas, testified his Mastercard and two department store credit cards were stolen from him on September 21, 1985, in a Dallas parking lot. Harbolt was not the man who robbed him. Young never gave Harbolt permission to use the credit cards. The two department store credit cards were found in a briefcase in the van.

In March 1985, Doug Schultz of Dallas, Texas, lost his wallet containing an American Express card. When police arrested Harbolt he was carrying a wallet that contained an American Express card in Schultz's name.

## Discussion

### I

Harbolt contends his waiver of counsel was insufficient because amending the information to add another count as well as prior prison term enhancement allegations constituted a change in circumstances that required a new advisement of the consequences of self-representation. He maintains the trial court's failure to readvise him of the maximum penal consequences after the new count and the prior-prison-term enhancement allegations were added rendered the previous waiver less than "knowing and intelligent." As such, Harbolt argues, the previous waiver was defective under *Faretta* v. *California* (1975) 422 U.S. 806, 835 [45 L.Ed.2d 562, 581, 95 S.Ct. 2525], which provided a criminal defendant has the right to represent himself as long as the decision to waive the right of counsel is made knowingly and intelligently.

Harbolt is wrong.

The record shows that after his preliminary hearing, Harbolt submitted a *Faretta* motion, asking the trial court to allow him to represent himself. This colloquy followed at his arraignment in Superior Court on November 27, 1985: "The Court: Mr. Harbolt has filed a motion with the court requesting that he represent himself. [¶] Do you still want to do that?

"Defendant Harbolt: Yes, ma'am, all things considered.

"The Court: It's really not a wise idea.

"[Defense Counsel]: I've discussed the matter with Mr. Harbolt at the time of his preliminary hearing as well as today. We've discussed the

probability of filing [another] motion in this case. And I suggested to him that I go ahead and do the motion. And then at that time, if he wants to represent himself, if that motion was to fail, he'd have that option.

"The Court:   That seems a reasonable approach to take. [¶] You know, there are [fashions] in the jail. And one fashion that seems to be in the jail right now is representing yourself. And what will happen is the first ten guys who do it will go down in flames, and then no one will do it for the next six months. And it really does go up and down. It's an unwise proposition. You hear about the rare instance where the guy gets an acquittal. It's really rare, believe me. [¶] Are you willing to withdraw this for the moment and allow [defense counsel] to file that motion?

"Defendant Harbolt:   Your Honor, in regards to—I believe, the motion is going to be regarding suppression. [¶] How long of a time frame are we talking about?

"The Court:   We're talking about a January motion. We're not giving motion dates now before January.

"Defendant Harbolt:   Okay. I think that I'd like to persist in the motion to represent myself.

"The Court:   Okay. I'm going to go through with you and discuss with you the risks. First of all, you are charged with three counts of—the maximum term of imprisonment for these counts would be four years four months. [¶] Correct?

"Defendant Harbolt:   That's not what my attorney has told me or what has been previously—

"The Court:   That's not necessarily what the court would do or what you should expect. But if you look at the maximum, we have three separate counts. And if they were to run consecutive, three plus one third the mid, or eight, plus eight, which is four years four months in state prison. [¶] There are a lot of risks of self-representation, the first one being that you didn't even know what the maximum penalties were. Attorneys go to school. You know, they have four years of college education, three years of law school education. And then they go and they get trained for a long time. If you—

"Defendant Harbolt:   Your Honor, in this vein, I'd like to indicate that I do have some previous experience. And although I'm not certified as a paralegal, I believe that there was even a case cited in that particular motion which should take any concern about my ability to represent myself—

"The Court: What is your background? [¶] Tell me about it.

"Defendant Harbolt: Primarily, a jailhouse lawyer for eight years in the federal system.

"The Court: Have you been incarcerated for eight years?

"Defendant Harbolt: Yes, ma'am.

"The Court: Okay. Well, then you know the system. [¶] What's your formal education?

"Defendant Harbolt: Some college.

"The Court: How much college, sir?

"Defendant Harbolt: One semester.

"The Court: You read and [write] the English language?

"Defendant Harbolt: Yes, I do, ma'am.

"The Court: You know that, if you represent yourself, no special assistance or favors will be awarded by the court. And you will be opposed by a trained prosecutor?

"Defendant Harbolt: That's correct.

"The Court: Do you understand that you are required to comply with all the rules of criminal procedure and evidence? [¶] And that's a very frustrating thing, because I've had pro pers in here. People make objections. I sustain them. They don't know what the heck is happening.

"Defendant Harbolt: A lot of this may go as to whether somebody is going to be working in an advisory capacity. If I'm staying completely alone—

"The Court: You're staying completely alone. I'm not going to appoint an advisory counsel for you.

"Defendant Harbolt: Okay.

"The Court: So you do have to comply with the rules of evidence and criminal procedure. You know, you can't say on appeal that you were

denied effective representation of counsel. So if you're convicted, you can't claim that as error on appeal. And, further, any disruptive behavior would terminate your right to represent yourself. [¶] Do you understand this?

"Defendant Harbolt: Yes, your Honor.

". . . . . . . . . . . . . . . . . . . . .

"The Court: Do you want to represent yourself, sir?

"Defendant Harbolt: Yes, I do, your Honor."

The record further shows on January 16, 1986, the district attorney's office filed an amended information that included an additional charge and on April 21, 1986, the first day of trial, the district attorney's office filed a supplement to the information that alleged six prior prison term enhancements within the meaning of section 667.5, subdivision (b).

The amended information was filed during a hearing on Harbolt's motions pursuant to sections 995 and 1538.5, which were denied. Harbolt asked the trial court to appoint counsel to represent him in this court on a writ of mandate with respect to the denial of his motions. However, when Harbolt was arraigned on the amended information and entered a plea of not guilty during the same hearing, he did not request counsel. Similarly, when the supplement to the information alleging the priors was filed in supervising criminal trial department, Harbolt was arraigned and denied the prior-prison-term enhancement allegations. He did not request counsel. Instead, he sought to have his in propria persona (pro. per.) telephone privileges reinstated[2] and indicated he had every intention to proceed to trial representing himself.

In recognizing the right to self-representation, the *Faretta* court held that a defendant's waiver of counsel must be made "knowingly and intelligently." (422 U.S. at p. 835 [45 L.Ed.2d at p. 581].) "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes

[2] After Harbolt complained to the supervising criminal court judge that his telephone privileges in the jail were being curtailed, the judge asked the sheriff's department to investigate. The supervising criminal court judge said he received a letter from the sheriff's department stating that Harbolt had made 1,703 phone calls, including 27 to a dial pornography service. On that basis, the judge refused to order the sheriff's department to reinstate the phone privileges.

open.' *Adams* v. *United States* ex rel. *McCann,* 317 U.S., at 279." (*Ibid.* [45 L.Ed.2d at pp. 581-582].)

In *Faretta,* the Supreme Court observed: "[W]eeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the 'ground rules' of trial procedure." (422 U.S. at pp. 835-836 [45 L.Ed.2d at p. 582], fn. omitted.) Here, the record discloses remarkably similar facts with regard to Harbolt and his decision to waive counsel. Our reading of the entire record with its attendant circumstances[3] shows Harbolt's decision to waive counsel and represent himself was made knowingly and intelligently as was his implicit decision to continue in pro. per. status when the amended information and the supplement to the information were filed.

The burden is on Harbolt to demonstrate that he did not intelligently and knowingly waive his right to counsel. (*People* v. *Mellor* (1984) 161 Cal.App.3d 32, 37 [207 Cal.Rptr. 383].) Harbolt has not met this burden.

As to Harbolt's contention the trial court erred by not advising him of the increased penal consequences of the amended information and the supplement to the information,[4] we disagree. The contention must fail because there is no requirement in this state for the trial court to give such advisements. Neither the United States Supreme Court nor any California case we have reviewed *requires* the trial court to specifically advise a defendant seeking to represent himself of the penal consequences. *Faretta* holds a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, regardless of how unwise such a choice might appear to be. (422 U.S. at pp. 835-836 [45 L.Ed.2d at pp. 581-582].) As to how the trial court can ascertain that the choice was made "knowingly and intelligently," the *Faretta* court merely

[3] The discussion between the trial court and the defendant at the time of the *Faretta* motion regarding the risks of self-representation should not be isolated from other factors of which the court is aware. (*People* v. *Floyd* (1970) 1 Cal.3d 694, 703 [83 Cal.Rptr. 608, 464 P.2d 64], disapproved on other grounds in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36 [148 Cal.Rptr. 890, 583 P.2d 748].) Here, an experienced and articulate jailhouse lawyer filed numerous motions throughout the pretrial stage and trial.

[4] At oral argument, Harbolt's counsel stated he did not assign error to the original advisement given when Harbolt first sought to represent himself, but rather contended the trial court was under an obligation to readvise Harbolt when the amended information and the supplement to the information were filed.

states the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' [Citation.]" (*Id.* at p. 835 [45 L.Ed.2d at p. 582].) As noted in *People* v. *Joseph* (1983) 34 Cal.3d 936, 945, footnote 4 [196 Cal.Rptr. 339, 671 P.2d 843], "California cases interpreting *Faretta* have prescribed certain admonitions which may comport with this requirement. (See, e.g., *People* v. *Lopez* (1977) 71 Cal.App.3d 568, 572-574 [138 Cal.Rptr. 36].)"

*People* v. *Lopez, supra,* 71 Cal.App.3d 568, in fact, was the first California case to advance the notion that defendants seeking to represent themselves should be advised of possible penal consequences.[5] It is significant, we believe, that the *Lopez* court emphasized it was not laying down requirements but only making suggestions as to avenues of inquiry a trial court should make when a defendant seeks to represent himself: "In addressing the problem of just what a court should do in ascertaining that the defendant's election is voluntary and intelligent, we do not wish to appear pedantic. Neither do we intend to establish any horrendously complex or rigid standards . . . . Rather, in the somewhat wistful hope that some trial judges may read this opinion, we will set forth certain suggestions on how to protect the record when a defendant chooses to go it alone." (71 Cal.App.3d at p. 571.)[6] In our research we have not found any California case that interprets *Faretta* so as to mandate an advisement on possible penal consequences. We conclude that what the cases do uniformly stand for is that the record must show the trial court determined the defendant was knowingly exercising his informed free will in waiving counsel. (See, e.g., *People* v. *McKenzie* (1983) 34 Cal.3d 616, 628 [194 Cal.Rptr. 462, 668 P.2d 769].)

[5] Actually, *Lopez* suggested the trial court cover three, nonexclusive, general categories in a *Faretta* hearing: (1) communicating the disadvantages of self-representation to the defendant; (2) ascertaining the defendant has sufficient intellectual capacity to make an intelligent decision; and (3) informing the defendant that he waives the right to appeal on the grounds of inadequacy of representation. In the second category, *Lopez* lists five areas of inquiry, including: "(d) Perhaps some exploration into the nature of the proceedings, the possible outcome, possible defenses and possible punishments might be in order. . . ." (*People* v. *Lopez, supra,* 71 Cal.App.3d 568, 573.)

[6] The *Lopez* court (Fourth Dist., Div. 2) subsequently reiterated that it had merely offered suggestions on how to conduct a *Faretta* hearing in *People* v. *Barlow* (1980) 103 Cal.App.3d 351 [163 Cal.Rptr. 664] and *People* v. *Mellor, supra,* 161 Cal.App.3d 32. In *Barlow,* the court said, "[W]hat followed in *Lopez* by way of the nature and extent of the inquiries and recitations to be made was pure dicta and was expressly characterized as a suggestion and not as an inflexible requirement." (103 Cal.App.3d at p. 365.) In *Mellor,* the court said, ". . . *Lopez* does *not* require any particular inquiries or pronouncements by the trial court." (161 Cal.App.3d at p. 37, italics in original.)

In any event, we recognize the suggested questions contained in *Lopez, supra,* 71 Cal.App.3d at pages 572-574, are an excellent outline for a trial court to follow in making the inquiry and establishing a record that the inquiry was adequate.

Nor are we persuaded by Harbolt's reliance on cases such as *United States* v. *Rylander* (9th Cir. 1983) 714 F.2d 996, which seem to require an advisement of possible penal consequences. While the Ninth Circuit has seen fit to adopt such a requirement, it is by no means binding on us. Furthermore, we observe *Rylander, supra,* and the other Ninth Circuit cases recognize a limited exception in which the trial court's failure to discuss possible penalties or other essential advisements will not result in reversal when the record as a whole reveals a knowing and intelligent waiver. (See *Cooley* v. *United States* (9th Cir. 1974) 501 F.2d 1249, 1252; *United States* v. *Harris* (9th Cir. 1982) 683 F.2d 322, 324; *U.S.* v. *Balough* (9th Cir. 1987) 820 F.2d 1485, 1488.) Here, as in *Cooley, supra,* the background and experience of the defendant in legal matters is apparent from the record.

Thus, Harbolt's argument that it was error not to readvise him of penal consequences when he was rearraigned must fail since there is no requirement in this state to make such an advisement—even when the defendant first requests to represent himself. If there is no absolute requirement at the initial *Faretta* hearing, it makes little sense to impose a mandate for repeated inquiry and advisement as a case progresses. Moreover, as discussed above, the record here shows without any doubt whatsoever that Harbolt's decision to waive counsel and represent himself was made knowingly and intelligently as was his implicit decision to continue in pro. per. status when the amended information and the supplement to the information were filed. This case simply does not present any rationale for imposing upon the trial courts of this state a requirement for repeated *Faretta* inquiry and advisements as a case progresses.

Harbolt's citation of *Ferrel* v. *Superior Court* (1978) 20 Cal.3d 888 [144 Cal.Rptr. 610, 576 P.2d 93], also is misplaced. *Ferrel* dealt with the trial court's decision to end defendant's pro. per. status following the suspension of his pro. per. jail privileges after he abused them. The *Ferrel* court said the defendant should have been given the option to proceed in pro. per. status notwithstanding the suspension of his pro. per. privileges. "[W]hen a valid limitation on or suspension of pro. per. privileges occurs, a defendant should be afforded the opportunity to reconsider whether he wants to proceed in pro. per. or have counsel appointed to represent him." (*Id.* at p. 892, fn. 5.) Harbolt contends that the suspension of pro. per. privileges in *Ferrel* was a change in circumstances analogous to the filing of additional charges here. Therefore, he argues he too should have been afforded an opportunity to reconsider whether he wanted to continue in his pro. per. status. But we are not persuaded. First, *Ferrel* is a narrow decision dealing with the suspension of pro. per. status after the suspension of pro. per. privileges, which is not at issue in this argument. Second, *Ferrel* deals with the propriety of

terminating a defendant's right to self-representation. Here, the issue is whether it was error to allow the self-representation *to continue* absent renewed advisement. We are not inclined to read *Ferrel* as broadly as Harbolt urges on appeal.

II

Harbolt contends the prosecutor, Deborah Factor, engaged in misconduct by intimidating a crucial defense witness, Richard Baldwin, and this misconduct requires reversal. We disagree.

In *In re Martin* (1987) 44 Cal.3d 1 [241 Cal.Rptr. 263, 744 P.2d 374], our Supreme Court's most recent statement on the issue, the court observes: "A defendant's constitutional right to compulsory process is violated when the government interferes with the exercise of his right to present witnesses on his own behalf. [Citations.]

"Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution. [Citations.]" (44 Cal.3d at p. 30.) The *Martin* court outlined a three-pronged test for establishing a violation of a defendant's constitutional compulsory-process right: (1) demonstrated misconduct, i.e., the government agent "engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as 'to transform [a defense witness] from a willing witness to one who would refuse to testify . . . .' "; (2) actual interference, i.e., "a causal link between the misconduct and [the defendant's] ability to present witnesses on his behalf"; and (3) materiality, i.e., a demonstration that there is "at least a reasonable possibility that the witness could have given testimony that would have been both material and favorable." (*Id.* at pp. 31-32.)

Harbolt contends Baldwin, who at the time of trial was in jail in Texas, would have testified he committed the crimes charged against Harbolt had Factor not telephoned him and threatened him with prosecution. He sought a dismissal of the charges, or in the alternative, a mistrial or sanctions against the prosecution in the form of a grant of immunity to Baldwin.

Outside the presence of the jury, the trial court questioned Factor, Baldwin and Andrew Aller, an attorney with the Office of Defender Services with whom Baldwin spoke after his conversation with Factor.

In its first inquiry with the prosecutor on May 7, 1986, the following colloquy took place: "The Court: . . . What happened? Did you talk to Mr. Baldwin?

"Ms. Factor: Yes I did. I spoke with him. [¶] I told him I was from the district attorney's office, that he did not have to talk with me. I told him what the defendant was bringing him out here for, and if he had to make any comments on it. [¶] I also told him the charges that the defendant was charged with and he told me that that was not at all what he had been informed Mr. Harbolt was charged with, and that he has nothing to do with any of these crimes.

"The Court: Did you—what did you respond?

"Ms. Factor: I did not discourage him from testifying. I told him that he didn't have to talk with me, but that this was what I was told he was going to come out here and say was that he committed all these crimes and he said no.

"The Court: Did you tell him that if he came here and testified he would be prosecuted and et cetera, et cetera?

"Ms. Factor: No [¶] I told him that my understanding was—of the law was that if he came out here, you know, and told all these things, that something—it could be in the future that he could be prosecuted but that—before I even said that he said 'I didn't do any of those things. I've been in jail during this period of time.' "

This colloquy was immediately followed by the testimony of Aller, who said on May 6, 1986, Baldwin called his office and wanted to inform Harbolt that "he had received a telephone call from the district attorney in San Diego County and that it was his understanding from the district attorney that he was going to be prosecuted for crimes that [Harbolt was] charged with should he come to testify that he performed any of those." Aller also testified that Baldwin told him "his attitude or outlook had changed as to whether or not he was going to testify" and the reason for the change was "[f]ear from prosecution."

After hearing Aller's testimony, the trial court and the prosecutor engaged in a second colloquy on the issue: "The Court: Well, preliminarily, I don't think the district attorney has any business calling a witness and telling him that he may be subject to prosecution for—you did tell him that?

"Ms. Factor: No, your Honor.

"The Court: Okay. [¶] Tell me what you told him, then.

"Ms. Factor: He told me that he thought he was coming out here to testify as to a credit card abuse. That that's what he had been told the

charges were. And I said, no, I said Don Harbolt's [*sic*] been charged with, and I told him the crimes and the dates and he said 'I don't—Don's [*sic*] been sending me all types of mailgrams under different names from the jail indicating that I would come out here and testify to this.'

"I said, well, these are the crimes and he thinks you're going to come out here and testify that [*sic*] committed all these crimes.

"And he said, 'Well, then, I've been a sucker because I'm not coming out here to—I don't have anything to do with that stuff.'

"And I said, Well, you know, fine. . . . [¶] . . . Then I said, well, are you involved in it in any way? He said 'No.' He said, 'What would happen if I come out here?' I said, Well, you can come out here and testify what you just told me, as long as you're telling the truth, fine, you can come out here.

"If you come out here and testify you committed these crimes, then I said, well, you know, action could be taken, you know, depending on what you say on the stand.

"That's what I told him."

Following this colloquy, the court found that it was only after Baldwin told Factor that he was not involved with the crimes charged against Harbolt that she raised the possibility of prosecution. After Baldwin arrived from Texas, the trial court on May 9, 1986, held a hearing outside the presence of the jury in which it and counsel questioned Baldwin. Baldwin testified that he told Factor he did not commit the crimes, and he was not intimidated by Factor telling him he could be prosecuted. After conferring with a court-appointed counsel, Baldwin declined to testify about the case on the basis of the Fifth Amendment.

We note that in *In re Martin, supra,* 44 Cal.3d 1, the Supreme Court found the prosecutor's actions in communicating to counsel for a defense witness that the witness "*would be* prosecuted for *any* crime he revealed or committed in the course of his testimony—amounts to misconduct under the circumstances of this case." (*Id.* at p. 40, original italics.) The circumstances of *In re Martin* are clearly distinguishable from this case. In *In re Martin,* the prosecution's investigator arrested the first witness for the defense outside the courtroom in plain view of other defense witnesses and at least one member of the media, which widely reported the arrest. The Supreme Court adopted the finding of its specially-appointed referee that the explicit threat of prosecution, coupled with the well-known hostility of the prosecutor's office toward defense witnesses as evidenced by the arrest

of the first witness, caused three potential defense witnesses to refuse to testify. (*Id.* at p. 28.) Here, the overwhelmingly coercive atmosphere of *Martin* is absent.

Moreover, Factor's statement regarding possible prosecution does not share the intimidating nature of the threats to prosecute in *People* v. *Warren* (1984) 161 Cal.App.3d 961 [207 Cal.Rptr. 912] and *People* v. *Bryant* (1984) 157 Cal.App.3d 582 [203 Cal.Rptr. 733]. Rather, it appears Factor's comments to Baldwin amounted to a "mere warning" about the dangers of perjury. (See *In re Martin, supra,* 44 Cal.3d at p. 41, fn. 8.) Under these circumstances, we do not find misconduct.

However, assuming arguendo that Factor committed misconduct, on this record Harbolt does not meet the second or third prongs of the *Martin* test. Baldwin told Factor that he had not committed the crimes and was not intending to testify that he did before she mentioned possible prosecution. Hence, Factor's purported misconduct was not the reason that Baldwin did not testify as Harbolt wished he would. Also, Harbolt fails to demonstrate the materiality of Baldwin's testimony. While Harbolt's offer of proof—that Baldwin "is the actual perpetrator of all four of the crimes that I'm presently charged with and is willing to admit so"—would satisfy the materiality requirement, in light of Baldwin's representations under oath at the May 9, 1986, hearing, this offer of proof does not shoulder the burden of demonstrating materiality.

III

Harbolt contends the trial court committed reversible error by failing to maintain an unbiased attitude toward the defense. Harbolt argues he was prejudiced because purported preferential treatment of the prosecution gave the jury the impression that the judge favored the prosecution. Harbolt cites instances in which the trial court did not assist him in presenting evidence and instances in which the trial court assisted the prosecutor.

For example, during the cross-examination of a police detective, Harbolt encountered difficulty in laying a foundation for the introduction of a document. The trial court did not assist Harbolt and the document was not introduced: "HARBOLT: Your Honor, could—I'd like to make a motion that that particular document be introduced into evidence since it's a business record or a record that was taken during the ordinary course of business of the police department.

"THE COURT: That's what you say. I haven't heard the evidence. Your motion is denied.

"HARBOLT: Okay. Mr. Colvin, do you recognize that particular exhibit which is marked Defendant's Exhibit D?

"COLVIN: Yes, sir; I do.

"HARBOLT: Does it appear to be a true and accurate copy of the original which is in the file with the—the records of your office?

"COLVIN: Yes, it does.

"HARBOLT: At this time, I would like to ask that the court allow me to introduce Exhibit D.

"THE COURT: Your motion is denied."

An example of the trial court assisting the prosecutor occurred during the examination of an expert on fingerprint identification. When Prosecutor Factor sought to question the expert about comparing a latent fingerprint from the evidence of the crimes with the fingerprint impressions recorded on Harbolt's booking document, Harbolt successfully objected on the basis of "[l]ack of foundation. There has been no foundation those are my fingerprints." The trial court then excused the jury and the following colloquy took place: "THE COURT: Miss Factor, this expert can testify as to the similarities or dissimilarities of the fingerprints taken from the documents, from the money orders and the fingerprints on the chart. He can do that now.

"But the defendant has raised an objection as to who those fingerprints belong to, whom do those fingerprints belong. And I'm sorry, but you will have to bring in—I am not sorry he has raised an objection and you must bring in, not necessarily the person who took his fingerprints, but some foundation as to Exhibit—what is it, 50?

"MS. FACTOR: Yes. I understand that.

"THE COURT: Some foundation. You may have to call an additional witness.

"MS. FACTOR: I will call a sheriff as to how they book and fingerprint an individual.

"THE COURT: What?

"MS. FACTOR: How they book and fingerprint an individual.

"THE COURT: You will have to have a foundation for that particular document which is No. 50. The document, some records, something that will satisfy the law. Okay?

"MS. FACTOR: Yes.

"At this time I am just going to refer to it as the document with Don Harbolt's name on it.

"THE COURT: Yes. You will have to refer—it has a name there, but the jurors already know that I have said that it doesn't show that they are his fingerprints, though.

"MS. FACTOR: I understand, Your Honor."

Harbolt brought the seeming disparity in treatment to the court's attention.

"MR. HARBOLT: Your Honor, I would also at this time like to request of the Court instances where I am having trouble getting evidence introduced if the Court could so advise me as you have just advised Miss Factor about what is required.

"THE COURT: No. No, no, no. You didn't understand. [¶] You raised an objection, and I am telling her to lay a foundation otherwise I will not allow the document in evidence. And she has nothing.

"MR. HARBOLT: I am saying when the role is reversed, when she raises an objection, you have never advised me like you advised her.

"THE COURT: Court is in recess. I won't even answer that."

First, we observe that at the time of his arraignment, the trial court admonished Harbolt that he was required to comply with all rules of evidence and criminal procedure and that he would receive no special treatment because he was not an attorney. Harbolt elected to proceed nonetheless. At trial, Harbolt was opposed by a deputy attorney general (Factor) who was temporarily assigned to the district attorney's office through an exchange program.

We agree the record does disclose incidents in which the trial court advised the prosecutor and we do not condone such practice for it is essential to the administration of justice that trials be conducted with the utmost fairness and impartiality. However, we note that the incidents cited by

Harbolt usually took place outside the presence of the jury. We find none of these incidents—considered individually or together—rises to the level of prejudicial judicial misconduct that requires reversal.

For example, in *People* v. *Zammora* (1944) 66 Cal.App.2d 166 [152 P.2d 180], the trial court systematically belittled defense counsel in front of the jury. Among other things, the trial court accused counsel of being asleep and sarcastically suggested someone was using ventriloquism to make counsel's statements. Similarly, in *People* v. *Fatone* (1985) 165 Cal.App.3d 1164 [211 Cal.Rptr. 288], the trial court repeatedly displayed a "demeaning, patronizing attitude" toward defense counsel in front of the jury. (*Id.* at p. 1176.) Among other things, the trial court admonished counsel to stay awake, called counsel's questions "[m]uch ado about minutia," characterized one of counsel's comments as "a little old lady's comment," and cynically referred to counsel as " '[y]our lordship.' " (*Id.* at pp. 1177-1180.) In *People* v. *Long* (1944) 63 Cal.App.2d 679 [147 P.2d 659], a statutory rape prosecution, the trial court sua sponte ordered nude photographs of the victim purportedly taken by the defendant to be exhibited to a defense character witness and compelled the witness to answer the prosecution's questions on whether the photographs changed his opinion of the defendant's character reputation.

The instances cited by Harbolt pale in comparison.

Moreover, the trial court instructed the jury pursuant to CALJIC No. 17.30: "I have not intended by anything I have said or done, or by any questions that I may have asked, or by any ruling I may have made, to intimate or suggest what you should find to be the facts on any questions submitted to you, or that I believe or disbelieve any witness.

"If anything I have done or said has seemed to so indicate, you will disregard it and form your own opinion." ■ We can assume that the jury followed the instruction. (*People* v. *Romo* (1975) 14 Cal.3d 189, 195 [121 Cal.Rptr. 111, 534 P.2d 1015].) ■ Hence, any possible prejudice flowing from the purported preferential treatment was dispelled.

IV

■ In his appeal and in two[7] subsequent petitions for writ of habeas corpus, Harbolt assigns as error the imposition of a one-year sentence enhancement pursuant to section 667.5, subdivision (b), for his alleged fourth,

[7] Harbolt's appointed counsel on appeal has filed a petition for writ of habeas corpus on Harbolt's behalf. Harbolt in pro. per. also has filed a writ of habeas corpus.

fifth and sixth prior felony convictions in the supplement to the information.[8] We agree.

Subdivision (f) of section 667.5 provides that a prior conviction from another jurisdiction includes as an element that "the defendant served one year or more in prison for the offense in the other jurisdiction." In *People* v. *Pinette* (1985) 163 Cal.App.3d 1122, 1124 [210 Cal.Rptr. 107], the court construed the language of subdivision (f) and held an enhancement for a foreign conviction can be imposed only if the defendant served one year or more in prison.

Harbolt's appellate counsel has attached to the petition for writ of habeas corpus certified copies from the clerk of the district court in Dallas County, Texas, showing that Harbolt was sentenced on February 23, 1981, on the three convictions, with credit for time served beginning November 4, 1980. Also attached to the petition is a certificate of parole from the Texas Board of Pardons and Paroles, which indicates Harbolt was released on parole on September 29, 1981. Hence, he served less than one year in prison and under section 667.5, subdivision (f), it was improper to impose a one-year enhancement. Accordingly, this one-year enhancement must be stricken.

V

We have reviewed and considered the remaining contentions Harbolt raises in his pro. per. petition for writ of habeas corpus: (1) the district attorney failed to prove the prior convictions for offenses committed in foreign jurisdictions included the elements of the corresponding California felonies; (2) the jury instruction on the lesser-included offense for grand theft auto was erroneous; (3) the trial court erred in failing to conduct a hearing on Harbolt's mental and physical competency for self-representation; (4) the trial court erred in imposing a felony term for the section 484e, subdivision (2), count; (5) the trial court erred in refusing to allow expert testimony on eyewitness identification; (6) the trial court erred in upholding the suspension of Harbolt's pro. per. telephone privileges, and (7) the trial court erred in denying Harbolt's motion pursuant to *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361].

Except for the contention regarding the felony sentence for the section 484e, subdivision (2), count, we find Harbolt's arguments meritless. Section 484e, subdivision (2), is petty theft, a misdemeanor. Harbolt, therefore, should not have been sentenced to a subordinate consecutive term

[8] For enhancement purposes, the trial court found the fourth, fifth and sixth priors constituted one prior conviction.

pursuant to section 1170.1, subdivision (a). (*People* v. *Hartsfield* (1981) 117 Cal.App.3d 504, 508 [172 Cal.Rptr. 794].) The consecutive sentence of eight months in prison for violating section 484e, subdivision (2), must be stricken. Petty theft is punishable by imprisonment in the county jail not exceeding six months. (§ 490.) Accordingly, in view of the trial court's determination the term for the section 484e, subdivision (2), offense is to be a consecutive sentence, at the conclusion of Harbolt's prison sentence as modified, he shall serve six months in the county jail.

## DISPOSITION

The trial court is directed to modify the judgment in accordance with the views expressed in this opinion, and to prepare an appropriate abstract of judgment and forward it to the Department of Corrections. In all other respects, the judgment is affirmed and the petitions for writ of habeas corpus are denied.

Kremer, P. J., and Staniforth, J.,* concurred.

A petition for a rehearing was denied December 23, 1988.

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.