[No. B196516. Second Dist., Div. Eight. Nov. 19, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
WALLACE CONNERS, Defendant and Appellant.

## Counsel

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**COOPER, P. J.—**

## SUMMARY

Wallace Conners was convicted of receiving stolen property and money laundering. He contends reversal is required because the trial court erred in allowing him to represent himself at trial without first advising him of the penal consequences of conviction; he was denied a fair sentencing hearing; and the trial court erred in failing to stay the sentence for receiving stolen property under Penal Code section 654. He further claims his convictions must be reversed because there was insufficient evidence he had knowledge of any criminal activity.

We affirm Conners's conviction, but conclude he is entitled to a new sentencing hearing and that his sentence for receiving stolen property should have been stayed.

## FACTUAL AND PROCEDURAL BACKGROUND

A second amended information filed October 27, 2006, charged Wallace Conners with receiving stolen property (Pen. Code, § 496, subd. (a)) and money laundering.[1] (§ 186.10, subd. (a).) The information also alleged several prior felony convictions.[2] The charges were in connection with five checks payable to Conners from the account of an entity called I Will Step Foundation, in amounts less than $10,000. The funds in I Will Step Foundation's account were stolen pursuant to a fraudulent real estate scheme in which a number of other persons, including Conners's wife, Janie Burns, were involved.

On October 12, 2006, Conners announced his desire to represent himself. The court (Judge Anita H. Dymant) observed that it needed "to make sure that you understand the pitfalls, the dangers and generally the bad idea that

---

[1] All statutory references are to the Penal Code, unless otherwise specified.

[2] The information alleged two prior convictions of a serious or violent felony in Missouri in 1974. (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i).) It also alleged prior felony convictions within the meaning of section 1203, subdivision (e)(4)—three in Missouri in 1971 and three in Los Angeles County (two in 1992 and one in 2000).

representing oneself is," and that Conners first had to fill out a rather lengthy form. After Conners completed the form, an extensive colloquy ensued (reproduced in the margin), during which the court advised Conners of the multiple disadvantages of representing himself.[3] These advisements did not

---

[3] "The Court: Now, first thing I want to say is this is obviously a complex case, just from what I have heard, and what I have read, as you know, this is a case which is essentially a kind of a fraud case, and so it's not a matter of a whodunnit. It's a matter of state of mind and intent and other more just complex issues [than], you know, a crime show on TV would talk about, okay.

"The Defendant: Yes, ma'am.

"The Court: So that means that it's going to be even more difficult for a person with no legal training or experience such as you to effectively represent yourself in this case. [¶] Do you understand that?

"The Defendant: Yes, ma'am.

"The Court: The prosecutor in this case, Mr. Wilson, is with a special unit, and all he does is fraud cases all day long. That's all he does. So you understand that you'll be at a disadvantage facing an experienced prosecutor in this case?

"The Defendant: Yes, ma'am. Well, I don't think I will be at a disadvantage, but I understand what you are saying.

"The Court: You will be at a disadvantage. That doesn't mean that you might not have a good result, but it will be a disadvantage for you because you may know the facts, you may know what you want to have the jury understand or the judge understand, but because you're unfamiliar with the legal rules and you're unfamiliar with the rules of evidence, it may—you may not be able to get it out there. [¶] I have presided over several pro per trials, and pro pers, it doesn't matter whether you're smart or not smart or whatever, if you're not a lawyer and not just a lawyer, if you're not experienced in trial practice, there are lots of lawyers who are brilliant people and they couldn't try their way out of a paper bag in court. Okay?

"The Defendant: Yes, ma'am.

"The Court: So we're talking about trial practice. [¶] People get very frustrated when they can't ask a question right and it keeps getting objected to and the court keeps sustaining it. That's the way you are at a disadvantage.

"The Defendant: Yes, ma'am.

"The Court: You don't know the rules of evidence. You don't know how to frame questions. You don't necessarily know how to introduce evidence. You may not know just legally how to make the argument. It doesn't mean you don't have a good position or a good case, but it would be a better case with a lawyer, and that's just a matter of common sense. It's also a matter of Supreme Court authority. [¶] So do you understand all of that?

"The Defendant: Yes, ma'am.

"The Court: Now, do you understand that the court is not going to appoint an attorney to help you out or give you hints [on] how to do stuff in court?

"The Defendant: Yes, ma'am.

"The Court: So you're going to be flying solo if you still want to represent yourself.

"The Defendant: Yes, ma'am, absolutely.

"The Court: Okay. In addition, the court will not tell you—and I don't know who is going to be the trial judge. . . . [B]ut wherever it is that the case proceeds to trial, you understand that the judge there will not tell you how it is you should ask the questions or give you any suggestions about how to put on your case, you'll be on your own? [¶] Do you understand?

"The Defendant: Yes, ma'am, definitely.

"The Court: All right. One other thing, if you are represented by a lawyer and you get convicted of something, you can always appeal or ask for another court to review your conviction on the argument that your attorney did a bad job, okay, your attorney missed

include any discussion of the maximum term Conners faced if convicted. The court found Conners understood the disadvantages of self-representation and granted his request. The matter was continued to October 27, 2006.

On October 27, 2006, both sides announced ready for trial, and Judge Dymant stated the case would be transferred for assignment to a trial court on the following Monday. During a discussion of whether the proceeding was a

---

something, didn't call a witness they should have, didn't make an argument they should have. [¶] But when you represent yourself, you can't make that argument. You can't say 'I did a terrible job, I just missed this and I didn't know what I was doing.' That's because the law basically presumes you don't know what you are doing.

"The Defendant: Yes, ma'am.

"The Court: So they don't let you raise that issue, but if your attorney messed up, you could raise that issue later on. [¶] Do you understand that?

"The Defendant: Yes, ma'am, I understand.

"The Court: That's another way you are at a disadvantage. Do you still want to represent yourself?

"The Defendant: I definitely want to represent myself.

"The Court: Just the basics. [¶] You understand that as a defendant in a criminal case you are entitled to be represented by an attorney, either one that you pay for or one that the court appoints you at no charge if you can't afford one?

"The Defendant: Yes, ma'am.

"The Court: Okay. . . . [¶] You will essentially be held to the same standards as a lawyer in trial. That means that whatever rules apply in the court, whatever type of etiquette the court requires in terms of the practice of the court, in terms of how to address the court, how to address the jury, how to offer exhibits, how to question witnesses, all of that you will be held to the same standards as an attorney, and the court is not going to spend a lot of time telling you how to do things because you'll be presumed to know or it will be your job to find out. [¶] Do you understand?

"The Defendant: Yes, ma'am. Yes, ma'am.

"The Court: Do you still want to represent yourself?

"The Defendant: Absolutely.

"The Court: . . . [¶] [A]ny serious misbehavior could result in your pro per rights being terminated and counsel either appointed or counsel brought in to finish the trial. [¶] Do you understand that?

"The Defendant: Yes, ma'am. [¶] . . . [¶]

"The Court: And based on what you know about the case, your request at this time to represent yourself does not include a request to postpone the case, you want to go to trial within the 20 days?

"The Defendant: Absolutely.

"The Court: Okay. Do you have any questions that you want to ask the court before I take your waiver?

"The Defendant: No. . . . [¶] . . . [¶]

"The Court: . . . [¶] All right. Having heard all of my admonitions and having read this form, do you still wish to waive and give up your right to represent yourself [sic]?

"The Defendant: Yes, ma'am.

"The Court: All right. The court accepts the waiver of counsel and request to proceed pro per. [¶] The court grants the defendant the right to proceed pro per. I find that the defendant has knowingly, intelligently and voluntarily waived his right to counsel."

second strike case, the prosecutor stated the People's position that it was a presumptive second strike case, and the court asked, "[What] is the People's offer?" The prosecutor advised it had offered two years in prison; Conners stated his counteroffer was dismissal. The court then stated that "the maximum exposure as a second strike is three years doubled. That's high term for six, plus one-third, that's eight, 16 months. So that would be seven years, four months. [¶] . . . [¶] So the offer is less than a third of the maximum exposure."

The case was called for trial on October 31, 2006, before Judge H. Randolph Moore, who observed:

"I see you are representing yourself; is that correct, sir?

"The Defendant: Yes, sir.

"The Court: And you've been through all the why for's of the dangers of representing yourself, and in spite of all of those—

"The Defendant: Yes.

"The Court:—you still decide to do it?

"The Defendant: Yes, sir.

"The Court: All right. You know, I don't know whether or not the judges that talked to you previously said anything about it. To me, representing yourself is like getting rid of the doctor and taking your own appendix out, or having a bad tooth and telling the dentist to go fly a kite and you pull it. That's about the same position you're in. They have the expertise, and the lawyers do, too, and if you make mistakes, as they've indicated to you here, you can't use that as an excuse if you're convicted.

"The Defendant: Yes, sir."[4]

The evidence at Conners's trial showed a fraudulent real estate scheme involving a property at 3224 West 110th Street in Inglewood. The property was owned by Areathia Smith, who resided in Alaska. Smith's name, along

---

[4] The court continued, "The other thing is that you're gonna have to pick a jury," and asked whether Conners had ever picked a jury before. Conners said he had, in another state in 1981.

with that of her deceased brother, who had owned the property jointly with Smith, appeared on a forged grant deed as sellers, but Smith had no intent to sell the property and knew no one involved in the transaction. The same was true of the buyer, listed as Yanase Yasuyuki, who then lived in Japan. Vilma Cooper, an escrow agent who testified at trial, received an escrow package from Hector Laino, a person she believed to be a licensed real estate broker. Fremont Investment & Loan received a loan application it believed to be legitimate, and funded two trust deed loans amounting to well over $250,000. Cooper processed the paperwork, and received a wire transfer from Fremont funding the loans. Relying on fraudulent escrow instructions, Cooper disbursed the funds, including a check for $125,159.71 of the loan proceeds payable to the I Will Step Foundation. The check for these funds, endorsed by Conners's wife, Janie Burns, was deposited in the Foundation's account at the Bank of America on January 3, 2003.

Thereafter, five checks were written on the Foundation's account, signed by Janie Burns and payable to Wallace Conners. These were dated January 14, 2003 ($9,500), January 16, 2003 ($9,500), January 18, 2003 ($9,755.60), January 21, 2003 ($9,000), and January 22, 2003 ($6,500). In one case (the Jan. 16th check), Conners's name was lined out and replaced with "Cash." Angela Hernandez, a custodian of records for the Bank of America, testified that cash was paid out to the endorser (Conners) of the five checks. Hernandez also testified that the average balance in the Foundation's account for the months preceding and following these transactions (Dec. 2002 and Feb. 2003) was less than $1,000.

The Foundation's address, as shown on the Foundation's checks to Conners, was 3540 Wilshire Boulevard. The escrow instructions for the sale of the Smith property, purportedly signed by Smith and her dead brother as well as the buyer, showed both the buyer's and the seller's mailing addresses as 3540 Wilshire Boulevard, # 1042. Fremont's loan package included an address certification for the purported borrower, Yanase Yasuyuki, showing 3540 Wilshire Boulevard, # 1042, as the borrower's mailing address, and a rent verification request on the borrower which was sent to a property management company at 3540 Wilshire Boulevard, Suite 1042 (and signed by "Jennie Burins"). A search of Conners's home, which he shared with his wife and children, yielded in documents showing Conners had an office at 3540 Wilshire Boulevard, # 1042, and that the rent for that office and telephone service for that office were billed to him. The documents also showed a note, purportedly from Wallace Conners, stating that the listing for the telephone

number at that address was to be changed from Nozar.Com (Nozar) to I Will Step Foundation. Another form purportedly showing Conners as the signing customer stated that the telephone number was to be listed for both Nozar and I Will Step Foundation, and listed "Janie or Wallace Conners" as customer contact names.

The search of Conners's home also uncovered, from the living room of the house, a partial copy of the deed of trust for the fraudulent real estate transaction. Deputy Sheriff Dennis Watters, of the real estate fraud unit, testified that a notebook was found, in a briefcase in the den, containing a telephone number for "Hector," and the number was that of Hector Laino, who brought the loan package to the escrow company. Watters testified the notebook also contained mention of "Wallace" and "Nozar." Watters also stated that after the search, Conners, who was present, was very concerned that some of his personal legal papers were mixed in with the items seized in the search; Conners was allowed to look through all the items prior to their removal from the house.

Conners was convicted on both counts. He waived his right to a jury trial on the prior convictions, and the court found them to be true on November 8, 2006. A probation and sentencing hearing was scheduled for November 30. On November 14, 2006, Conners requested counsel for sentencing. A bar panel attorney (Jerry Fernandez) appeared on November 15 and told the court the case would be assigned to a "different grade" attorney. At the November 30 hearing, Fernandez appeared again, unable to explain why Conners had not yet been assigned a "grade four" attorney. The case was trailed to the following day. The next day, bar panel attorney Charles Windon appeared for Conners, and requested continuance to January 10, but indicated he would likely be unable to handle the matter. The court indicated it wanted an updated probation report.

At the January 10 hearing, bar panel attorney Jeffrey Yanuck appeared, requesting appointment. The court appointed him, and Yanuck requested another date for sentencing so that transcripts could be ordered for preparation of a new trial motion and a *Romero* motion. (*People v. Superior Court (Romero)* 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628].) No updated probation report had been received, and the court expressed its dissatisfaction with the July 20, 2006 report as "somewhat incomplete." The court denied Yanuck's motion to continue the matter. After argument, principally on the remoteness of the prior strike conviction and the lack of any recent serious or

violent felonies, Yanuck again pointed out he had just been appointed that day, and urged the court to give him an opportunity to prepare a written sentencing memorandum. Instead, the court sentenced Conners to four years in state prison: the midterm (two years) on the money laundering count, doubled for the strike. On the receiving stolen property count, a sentence of eight months was imposed, to run concurrently. A restitution fine of $200 and a parole revocation restitution fine of $200 (stayed) were imposed, along with a court security fee of $20, and the court ordered payment of restitution to the victim of $40,265.60.

Conners filed a timely appeal.

## DISCUSSION

We reject Conners's claims of insufficient evidence and *Faretta* error, but conclude he is entitled to a new sentencing hearing and his sentence for receiving stolen property should have been stayed. We address the issues in turn.

### 1.  The evidence was sufficient to sustain the convictions.

In reviewing Conners's claim, we determine whether, viewing the whole record in the light most favorable to the prosecution, the record discloses substantial evidence—evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640].) We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Ibid.*)

▉  To prove Conners guilty of money laundering, the prosecution had to show he conducted transactions involving monetary instruments of a total value exceeding $25,000 within a 30-day period, "(1) with the specific intent to . . . carry on, or facilitate the . . . carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity . . . ." (§ 186.10, subd. (a).) Conners argues the prosecution did not sustain its burden of proving he had knowledge of any fraudulent scheme, or knowledge that the funds in the I Will Step Foundation's bank account were fraudulently obtained. He contends a reasonable jury might be able to conclude that his

wife was involved in criminal activity, but not that he was involved. We cannot agree.

First, Conners relies on points he raised in his opening statement to suggest that he had nothing to do with the I Will Step Foundation. For example, he argues he had "a legitimate business doing entertainment promotion at 3540 Wilshire Boulevard"; his wife "ran her own separate business, I Will Step Foundation, from that address" and he had nothing to do with it; and he "shared an office with his wife," who "may have been using the premises for an untoward purpose, but that does not mean [Conners] was aware of it." But an opening statement is not evidence, and none of those purported facts was in evidence. The evidence showed that Conners alone was billed for the rent and telephone service at 3540 Wilshire Boulevard, No. 1042, the address used for the buyer, seller and rent verification purposes in the fraudulent real estate transaction, and it also showed a note, purportedly from "Wallace Conners," stating that the telephone listing at Conners's office should be changed from Nozar to I Will Step Foundation. A document relating to the fraudulent transaction was found in the home occupied by Conners and his wife and, at the time of the search, Conners was concerned that his personal legal papers were mixed in with the items seized by the police. We have no difficulty concluding that a reasonable jury could have inferred from this evidence, beyond a reasonable doubt, that Conners knew the five checks he cashed over a 10-day period represented the proceeds of criminal activity.

Conners makes a similar argument about the sufficiency of the evidence that he received stolen property, and it is similarly unavailing. The prosecution had to prove that Conners received stolen property knowing it to be stolen; Conners contends the prosecution did not prove he knew the money he obtained from the cashed checks was stolen. But again, Conners's knowledge that the funds were stolen may reasonably be inferred from the evidence that he controlled the office used to facilitate the fraudulent real estate transaction, and from the fact that a copy of a document from that transaction was found in his home. An appellate court "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].) " 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' " (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [43 Cal.Rptr.3d 741], quoting *People v. Hicks* (1982) 128 Cal.App.3d 423, 429

[180 Cal.Rptr. 391].) Conners's claims of insufficient evidence are without merit.

## 2. Conners's claim of *Faretta* error is without merit.

█ A defendant in a criminal proceeding has a federal constitutional right to counsel, which may be waived if the defendant wishes to represent himself at trial. (*Faretta v. California* (1975) 422 U.S. 806, 835 [45 L.Ed.2d 562, 95 S.Ct. 2525].) Because a waiver of the right to counsel relinquishes many of the benefits associated with that right, a knowing and intelligent waiver of the right to counsel is required before a criminal defendant is permitted to represent himself. (*Ibid.*) *Faretta* instructed that the defendant should be made aware of the dangers and disadvantages of self-representation; the record must establish that " 'he knows what he is doing and his choice is made with eyes open.' " (*Ibid.*) Our own Supreme Court instructs that "[t]he test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1225 [259 Cal.Rptr. 669, 774 P.2d 698].) On appeal, we review the entire record, including proceedings after the invocation of the right to self-representation, and determine de novo whether the defendant's waiver of the right to counsel was knowing and voluntary. (*People v. Marshall* (1997) 15 Cal.4th 1, 24 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

Conners asserts that, despite the extensive colloquy with Judge Dymant (see fn. 3, *ante*), and the shorter colloquy with the trial judge at the start of the trial, "at neither of the colloquies did either judge inquire into whether [Conners] understood the nature of charges against him and the potential penal penalties if he lost at trial." But:

—First, as to the nature of the charges, Conners's written October 12, 2006 *Faretta* waiver form reads, under the heading "Charges and Consequences," that "I understand that I am charged with the following crimes(s): <u>Count 33 (Receiving stolen property) Count 38 (money laudering) [*sic*]</u>." Conners further checked the "yes" boxes to questions asking whether he knew what facts had to be proved before he could be found guilty, and what the legal

defenses were to the crimes with which he was charged. And, the first thing Judge Dymant told Conners was that "this is obviously a complex case, . . . a case which is essentially a kind of a fraud case . . . . It's a matter of state of mind and intent and other more . . . complex issues . . . ."

—Second, as to the penal consequences, it is clear Conners knew what they were before the trial began on October 31, 2006. Judge Dymant stated, at the hearing on October 27, 2006, that the maximum exposure "would be seven years, four months." And when trial started a few days later, Judge Moore again inquired whether, having been through all the "why for's" with the other judge, "you still decide to do it?" and Conners replied in the affirmative.

■ We are aware some Court of Appeal cases have suggested that, to deem a *Faretta* waiver knowing and intelligent, the trial court must or should ensure the defendant understands the possible penalties, as well as the nature of the charges and the dangers of self-representation. (See *People v. Sullivan* (2007) 151 Cal.App.4th 524, 545 [59 Cal.Rptr.3d 876]; *People v. Noriega* (1997) 59 Cal.App.4th 311, 319 [69 Cal.Rptr.2d 127].) On the other hand, one case has expressly held there is no requirement to advise a defendant seeking to represent himself of the possible penal consequences of conviction. (*People v. Harbolt* (1988) 206 Cal.App.3d 140, 149–151 [253 Cal.Rptr. 390].) The overriding principle, however, remains as stated in *People v. Bloom, supra,* 48 Cal.3d at page 1225: the test of a valid waiver of counsel is based on the record as a whole. (See *People v. Marshall, supra,* 15 Cal.4th at p. 24 ["[e]ven when the trial court has failed to conduct a full and complete inquiry regarding a defendant's assertion of the right of self-representation, these courts examine the entire record to determine whether the invocation of the right of self-representation and waiver of the right to counsel was knowing and voluntary"].) Thus, it is clear that, (1) while Judge Dymant did not advise Conners of his maximum exposure before granting his *Faretta* motion, she did so at the October 27 hearing, before the trial began on October 31, and (2) Judge Moore questioned Conners further on October 31 to ensure Conners "still decide[d] to do it." Under these circumstances, the record as a whole demonstrates Conners understood the disadvantages of self-representation, including the penal consequences that might ensue if he were convicted. Accordingly, because Conners has not demonstrated that he did not knowingly and intelligently waive his right to counsel (*People v. Sullivan, supra,* 151 Cal.App.4th at p. 547), we must affirm his conviction.

### 3. The absence of a meaningful probation report and the court's refusal to continue the sentencing hearing requires a remand for resentencing.

Conners points out that under section 1203.10, at the time of a verdict of guilty, the probation officer, "when so directed by the court," must "inquire into the antecedents, character, history, family environment, and offense of such person, and must report the same to the court and file his report in writing . . . ." If the court has requested a probation report under section 1203.10, the court may not pronounce judgment upon the defendant "unless a copy of the probation report has been made available to the court, the prosecuting attorney, and the defendant or his or her attorney, at least two days or, upon the request of the defendant, five days prior to the time fixed by the court for consideration of the report with respect to pronouncement of judgment." (§ 1203d.) The report is then filed with the clerk at the time the court considers it.

Conners was convicted on November 7, 2006, and the court trial on his prior convictions occurred the next day. The court then stated: "I have a probation report which just has no information whatsoever in it and you need another probation report. And I want you to report to the probation officer one of two ways to do it in or out. But you have to have another probation report by the 30th of November." No further probation report was ever received.[5] The probation report referred to by the court, dated July 20, 2006, was prepared before Conners's trial and conviction. It contained information on Conners's prior record, but otherwise had, as the court observed, "no information whatsoever"—no information on the victim, no information on Conners's personal history, no statement from defendant, and no information regarding interested parties.[6]

---

[5] At the November 8 hearing, Conners (who had been released on his own recognizance throughout the trial) told the trial court he was going to report to the probation department "right now." At the sentencing hearing on January 10, 2007, the trial court asked Conners if he had talked to a probation officer, and he said, "I did. The first time that you told me, they said they was waiting on me. Then you reordered it. [¶] . . . [¶] You know, so I haven't talked to the probation department. Prior to everything I talked to her, but no one called me. I have been waiting. [¶] I called Mr. Windon [bar counsel] a thousand times. And I asked him about the matter and everything and I asked him who was appointed on the case and everything because I tried to make sure that I wasn't—nothing was caused by my fault or something . . . ."

[6] The report's evaluation stated: "It is too bad that defendant was not made available for an interview where he . . . would have been able to present his current personal history, his present use or non use of drugs and his stability status in the community. As it stands now, other than his extensive criminal history . . . , nothing is known about him. . . . With the above in mind, the only disposition that can be recommended is a state prison term, a term that defendant has managed to avoid for many years."

Nonetheless, despite the absence of the supplemental probation report ordered by the court on November 8, 2006, and despite the fact that bar counsel (Yanuck), who had just been appointed that day, requested a continuance—and expressly asked for an opportunity to prepare a written sentencing memorandum—the trial court imposed sentence on Conners.[7] We conclude the trial court's failure to grant a continuance under these circumstances violated statutory requirements and "rendered the sentencing hearing fundamentally unfair." (*People v. Leffel* (1987) 196 Cal.App.3d 1310, 1318–1319 [242 Cal.Rptr. 456].) *Leffel* is instructive. In *Leffel*, the defendant did not receive his probation report nine days prior to the sentencing hearing, as mandated by section 1203, subdivision (b).[8] The court concluded defendant "was not afforded the proper opportunity to comprehend, analyze, investigate and evaluate the report"—an opportunity the Legislature "intended that he be given . . . ." (*Leffel*, at p. 1318.) In this case, the circumstances are worse, because there was, in effect, no probation report at all: despite the court's order to do so, no supplemental probation report was ever submitted, and the report that existed had no information in it. As the court stated in *Leffel*, "the possibilities for prejudice are clear and the actual prejudice suffered is a matter of conjecture." (*Ibid.*) Consequently, as in *Leffel*, Conners is entitled to a remand for resentencing, and "is also entitled to the preparation of an updated probation report, including information regarding [his] behavior while incarcerated during the pendency of this appeal . . . ." (*People v. Leffel, supra*, 196 Cal.App.3d at p. 1319; see also *People v. Bohannon* (2000) 82 Cal.App.4th 798, 809 [98 Cal.Rptr.2d 488] ["the Legislature has not sanctioned sentencings without probation reports except in those situations in which a defendant is wholly ineligible"].)[9]

---

[7] Before doing so, the trial court observed: "The thing that disturbs me, I guess—throughout my career I have been disturbed a number of times by Probation. They just don't do what you tell them to do unless you get on the phone, and something tells me I should have done that. But unless you are screaming and threatening, they don't get work done that they are supposed to get done. I have more information about you from looking at the file and from talking to you than is contained in this report of July of last year."

[8] In *People v. Leffel, supra*, 196 Cal.App.3d at page 1317, the court opined that section 1203 (rather than § 1203.10) was applicable in a case where probation was not statutorily prohibited. Under section 1203, if a person is convicted of a felony and is eligible for probation, the court must refer the matter to a probation officer to investigate and report upon the circumstances surrounding the crime and the prior history and record of the person. (§ 1203, subd. (b)(1).) The report must be made available to the court and prosecuting and defense attorneys at least five days (or, on request of the defendant or prosecuting attorney, nine days) prior to the hearing. (§ 1203, subd. (b)(2)(E).) Under either section 1203 or section 1203.10, a probation report was required in Conners's case before sentence was pronounced.

[9] *People v. Bohannon* was disapproved on an unrelated point in *People v. Zambrano* (2007) 41 Cal.4th 1082, 1185, footnote 13 [63 Cal.Rptr.3d 297, 163 P.3d 4].

### 4. The trial court erred in refusing to stay Conners's sentence for receiving stolen property under section 654.

■ Section 654 prohibits multiple punishment for a single criminal act and for two crimes arising from a single indivisible course of conduct in which the defendant had only one criminal intent or objective.[10] (*People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603 [80 Cal.Rptr.3d 551].) Thus: "If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525 [65 Cal.Rptr.3d 654].) Conners argues that punishing him for both money laundering and receiving stolen property is prohibited, because the evidence showed he harbored a single intent: to receive the stolen funds. We conclude Conners is correct.

■ In this case, there was clearly a single, indivisible course of conduct: Connors received and cashed five checks representing stolen funds, all in amounts under $10,000. Nor can we discern "multiple, independent objectives." (*People v. Perry, supra*, 154 Cal.App.4th at p. 1526.) We cannot disagree with Conners's claim that the evidence showed only one objective: to facilitate the receipt of stolen funds. The People counter that Conners "entertained multiple criminal objectives of both stealing the money and laundering it." But the People's assertion merely describes the two crimes. The question is whether the two crimes "were the means of accomplishing or facilitating one objective," in which case defendant may be punished only once. The most the People can say is that Conners intended to receive the stolen funds *and* to avoid detection. But the latter is clearly incidental to, not independent of, the former. Structuring his receipt of the stolen funds in amounts low enough to avoid detection was merely "the means of accomplishing or facilitating" a single criminal objective: the receipt of stolen funds. Accordingly, any sentence imposed on Conners at his resentencing must reflect a stay of the sentence for receiving stolen property.

---

[10] Section 654, subdivision (a), states in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

## DISPOSITION

The judgment of conviction is affirmed, and the matter is remanded to the trial court for resentencing after receipt of an updated probation report, with directions to stay any sentence on count 33 (receiving stolen property) under Penal Code section 654.

Rubin, J., and Flier, J., concurred.

A petition for a rehearing was denied December 10, 2008, and on December 8, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 11, 2009, S169211. Werdegar, J., did not participate therein.