Filed 9/10/13  In re D.F. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.F., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>D.F.,<br><br>        Defendant and Appellant. | F066183<br><br>(Super. Ct. No. 09CEJ600846-3)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gary D. Hoff, Judge.

Daniel A. Bacon for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and John G. McLean, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant D.F. was found by the juvenile court to have committed assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 1), second degree robbery (§ 211; count 2), grand theft person (§ 487, subd. (c); count 3), and two counts of misdemeanor battery (§ 242; counts 4 & 6).[2] The court further found that appellant personally inflicted great bodily injury in the commission of count 1 (§ 12022.7, subd. (a)). On appeal, appellant contends there is insufficient evidence to support the court's findings with respect to counts 1, 2, 4, and 6. He also contends insufficient evidence supports the section 12022.7 enhancement in count 1. We disagree with appellant's contentions and affirm the judgment.

## FACTS

### A. Prosecution Evidence

This appeal arises from appellant's involvement in two separate incidents on the night of June 5, 2012, at the Bob Belcher Park on Alluvial Avenue in Fresno.

### 1. The First Incident (Counts 4 & 6)

The first incident occurred around 7:00 p.m., after the victims, Mark Crenshaw and Nicholas Macias, met up with an acquaintance, Blair Stevens, at the park. At some point, Crenshaw and Macias went to the field area of the park, where they were approached by appellant, his codefendant, S.C., and a third, unknown male.

Appellant and S.C. started insulting Crenshaw; S.C. said his lip piercings were "gay" and appellant said his shoes were "dirty and messed up." Crenshaw tried to tell them he did not want any problems. When they continued insulting him, Crenshaw and Macias turned around and started to walk away.

As Crenshaw and Macias were walking down the field towards Alluvial Avenue, appellant, S.C., the third male, and a fourth, unknown male started following them.

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

[2] The court dismissed a second assault charge (count 5) pursuant to Welfare and Institutions Code, section 701.1.

2

Someone then started throwing small rocks at Crenshaw. The rocks missed and hit the ground in front of him. Although Crenshaw had his back turned to them, he believed appellant and S.C. were the ones throwing rocks at him. Crenshaw explained they were the only ones who were being aggressive with him, and he heard S.C. say "do you like pebbles" before the rocks started to be thrown at him.

After the rocks were thrown, Crenshaw saw S.C. holding a small, wooden "souvenir" baseball bat. S.C. struck Crenshaw's right arm once with the bat. Appellant then started walking towards Crenshaw and S.C. handed him the bat. As appellant walked towards Crenshaw with the bat, Macias held up his hand and stepped in front of appellant.

Appellant walked into Macias's hand with his shoulder. S.C. told Macias not to touch his friend and punched him in the face. Macias fell down and appellant's group surrounded him. Macias recalled that, while he was on the ground, both appellant and S.C. were hitting and kicking him. He also recalled that appellant hit him with the bat at least once during the incident. The attack lasted approximately four seconds. Macias testified he sustained a cut and swelling to two of his fingers and minor bruising to his body.

### 2. The Second Incident (Counts 1, 2 & 3)

The victim Andrew Pope met his friend, Amanda Ardemagni, at the park around 9:50 p.m. Ardemagni, who was having some personal issues, was crying and upset. Ardemagni and Pope talked together for a while at the park then decided to drive somewhere else to talk.

As Ardemagni and Pope were walking back to the parking lot, four males including appellant and S.C., ran up behind them. Pope turned around and asked them if they were good. Appellant said, "yeah, nigga, we good" and "[w]hat the fuck are you

3

doing." Pope made a few comments about not wanting any trouble. He then turned around and kept walking with Ardemagni towards their cars.

Appellant's group followed them and made remarks such as "come here, baby, we'll show you a good time." Ardemagni turned around and glared at them and then continued walking with Pope towards their cars. When appellant's group continued to follow them, Pope turned around and asked again whether they were good.

Appellant replied, "we faded, nigga, we faded." Appellant then called Pope a "punk ass nigga" and pushed him from behind. Pope told Ardemagni to run as the rest of appellant's group ran up to him. Before she ran, she saw Stevens—who had been in the park earlier with Crenshaw and Macias—punch Pope in the right temple. Pope stumbled and then appellant's group surrounded him.

Ardemagni ran into the middle of Alluvial Avenue and dialed 911. While on the phone with the 911 operator, she became very emotional. She could see the four males that comprised appellant's group were attacking Pope. Pope was on the ground and "kind of rolling around from the different blows he was getting." Ardemagni recalled seeing appellant kicking and punching Pope, primarily in the back and chest. She also saw S.C. kicking Pope "as hard as he could" in the stomach and sides, and she saw Stevens "kicking and stomping on his head."

While the rest of the group was still attacking Pope, Ardemagni saw appellant "rummaging" through Pope's back pockets and the pockets on his sweater. Ardemagni hung up during the 911 call, partly because she "vaguely" heard Pope's assailants "talking about finding his wallet and his phone." Ardemagni explained, "it clicked in my head, shit, we're being mugged and I need to hide my phone in case they come after me because this is the only thing I have to get us help."

When asked which occurred first, hearing the statements about getting Pope's wallet and phone or seeing appellant rummaging through Pope's pockets, Ardemagni

4

testified, "it was kind of all simultaneous." She added she thought she heard the statements after she saw appellant going through Pope's pockets but "[appellant] was still in his pockets while it was being said."

In the meantime, a car Ardemagni had flagged down during the 911 call turned around and drove back to her. When the car turned around, appellant's group stopped attacking Pope and fled.

On cross-examination, Ardemagni confirmed she heard someone say "[g]et his phone and wallet" during the assault, and testified that, if the police report said she heard the statement after the assault, the report would be wrong.

Pope recalled that, when he was on the ground, his "neck and head continued to get hit" and it felt like "multiple people" were hitting him. At some point, he lost consciousness. But before he lost consciousness, he heard someone say, "Take his fucking phone and his wallet" and felt someone going through his pockets. When Pope regained consciousness, he found he was no longer on the pavement but on the grass with Ardemagni holding his head and neck.

Pope recalled that when he was loaded into the ambulance, paramedics were tapping on him and telling him to stay awake, but he was not able to stay awake. The next thing he remembered was being in the emergency room. At the hospital, Pope underwent a CAT scan, received pain medication, and had to have stitches above both eyebrows.

After the incident, Pope continued to have head, neck, and back pain. He was prescribed pain medication and was in bed for two weeks. He also suffered from migraine headaches for approximately three weeks. The attack left visible scars above his eyebrows. He also suffered from anxiety in certain situations.

5

*Defense*

Fresno Police Officer Jeremy Preis interviewed Crenshaw and Macias on June 6, 2012, the day after the incident in the park. Macias told Officer Preis he knew appellant and S.C. were the people involved in the incident, and that S.C. hit him and Crenshaw with the souvenir bat. After S.C. hit him, Macias fell down and felt the bat hit him several more times. Macias put his hands over his head to block the blows. He also felt someone hitting and kicking him but could not describe who it was.

When Fresno Police Officer Steven Jaquez interviewed Ardemagni on the night of the incident, she made no mention of any profane statements being made by the suspects prior to the attack. She said one of the suspects pushed Pope on the chest, but she did not identify him. Ardemagni also said that, as the suspects fled, she heard one of them say, "I'm faded, nigga." She made no mention of items being taken from Pope.

Fresno Police Officer Christopher Lee conducted follow-up interviews of Ardemagni and Pope on June 21, 2012. Officer Lee specifically asked Pope if he remembered whether any demands were made for his cell phone and wallet. Pope said he could not remember, but he did not think so. Pope did not mention hearing anyone say to get his wallet or go through his pockets, or feeling anything being taken off him.

Officer Lee also asked Ardemagni if she heard the suspects demand Pope's wallet and phone prior to or during the assault. Ardemagni said she heard them say "get his phone and wallet" after the assault but was unsure if they took these items. She did not mention she saw the suspects going through Pope's pockets or grabbing items.

Fresno Police Officer Eric Sanders spoke to Pope at the hospital the night of the incident. Pope reported that, when he saw the suspects in the park, he asked them if they were okay but could not remember what exactly was said at that point. Pope explained that it hurt to think. Pope did recall a male wearing a red hoodie sweatshirt punched him in the side of the face and then being pushed by another male.

6

Officer Sanders learned from Pope that he no longer had his cell phone and wallet, and the officer confirmed with the paramedics that they did not remove anything from Pope's pockets. Pope did not say anything about what happened to his property. He never told Officer Sanders he heard any of the people say to get his wallet or phone. Nor did he say anything about feeling people rummaging through his pockets or taking items from him at the scene.

Dr. Richard Goka, a physician who specialized in physical medicine and rehabilitation, reviewed medical records and other documents relating to the injuries Pope sustained on June 5, 2012. In Dr. Goka's opinion, Pope's injuries were mild to moderate.

### *Rebuttal*

On June 5, 2012, Jesse Magana lived in a house across the street from Bob Belcher Park. Around 10:00 p.m., he heard a girl screaming. When he looked out his window, he saw a girl in the middle of Alluvial Avenue flagging down a car and screaming for help.

Magana jumped his back fence and crossed Alluvial Avenue to reach the park. There, he saw Pope lying in the parking lot area and Ardemagni trying to help him get up. Magana described Ardemagni's demeanor as hysterical and petrified.

Magana observed Pope was muttering incoherently and unable to stand on his own. Pope had blood streaming down his head and a big knot on his head the size of a baseball. Magana dragged Pope over to the grass area and laid him down. Magana never saw Pope unconscious during the time he was assisting him.

### *DISCUSSION*

Appellant contends the evidence is insufficient to support the juvenile court's findings he committed misdemeanor battery (counts 4 & 6), assault (count 1), and robbery (count 2). He also contends the evidence is insufficient to support the court's

7

finding he personally inflicted great bodily injury in committing the assault in count 1. For reasons discussed below, we find appellant's contentions unpersuasive.

### A. *Standard of Review*

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. It is the trier of fact that must be convinced of a defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts. We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) If the verdict is supported by substantial evidence, a reviewing court must accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences that the trier of fact might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

### B.  Substantial Evidence of Misdemeanor Battery

The juvenile court found that appellant committed misdemeanor battery on Crenshaw and Macias, the lesser included offense of the charged assaults in counts 4 and 6.  Appellant first contends there is insufficient evidence to support the juvenile court's finding he committed misdemeanor battery on Crenshaw because there is no substantial evidence he struck or touched Crenshaw in any way.  Respondent counters that substantial evidence supports the court's misdemeanor battery finding on a theory of aiding and abetting.[3]  We agree with respondent.

Battery is defined as "any willful and unlawful use of force or violence upon the person of another."  (§ 242.)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1994) 35 Cal.3d 547, 561; see *People v. Montoya* (1994) 7 Cal.4th 1027, 1039.)

"Among the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense."  (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; see *People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Jose T.* (1991) 230 Cal.App.3d

---

[3]    Contrary to appellant's assertion that the prosecutor never "argue[d] that appellant … was criminally responsible for a battery on … Crenshaw via an aiding and abetting theory," the prosecutor briefly stated in closing argument that "one could argue it was an aiding and abetting" in connection with appellant's role in S.C.'s attack on Crenshaw.

1455, 1460 ["Neither mere presence at the scene of a crime, nor the failure to take steps to prevent a crime, is alone sufficient to establish that a person is an aider and abettor. Such evidence may, however, be considered together with other evidence in determining that a person is an aider and abettor"].)

Applying these factors here supports the conclusion that appellant was an aider and abettor. Appellant was not simply a spectator but an active participant in the events surrounding S.C.'s attack on Crenshaw. Prior to the attack, appellant and S.C. both approached Crenshaw and made insulting comments on his appearance. When Crenshaw attempted to walk away, appellant and S.C. both followed him, and rocks were thrown at him from their direction. After S.C. struck Crenshaw on his arm with the souvenir baseball bat, he passed the bat to appellant as appellant moved towards Crenshaw. Appellant's conduct indicates he was intent on striking Crenshaw, and might very well have personally committed a battery on Crenshaw had Macias not intervened, at which point appellant and S.C. turned their attention to Macias and physically attacked him instead. Viewing these circumstances in the light most favorable to the judgment, we find the evidence was more than sufficient to support the conclusion that appellant aided and abetted S.C.'s commission of misdemeanor battery on Crenshaw.

We also find sufficient evidence that appellant committed misdemeanor battery on Macias. Macias's testimony that appellant was hitting and kicking him when he was on the ground and that appellant hit him at least once with the bat during the incident constitutes substantial evidence of the offense. Macias's prior police statement claiming he covered his face and was unable to describe the person who was hitting and kicking him does not necessarily render his testimony physically impossible or inherently improbable as appellant suggests. Macias, for whatever reason, might not have been completely forthcoming with the police. Recognizing the existence of "discrepancies in the evidence," the juvenile court nonetheless found "the witnesses generally credible and

10

persuasive in their testimony as to what transpired." We are not at liberty to second-guess the court's evaluation of Macias's credibility.

### C. *Substantial Evidence of Assault*

Appellant contends insufficient evidence supports the juvenile court's finding he committed assault under count 1, because there is no substantial evidence he applied to Pope force likely to result in great bodily injury and, therefore, the offense should be reduced to misdemeanor battery. We disagree.

Assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) The gravamen of the offense "'is the *likelihood* that the force applied or attempted to be applied will result in great bodily injury.' [Citation.]" (*People v. Williams* (2001) 26 Cal.4th 779, 787.) In other words, the crime focuses on what *might* happen, not what *did* happen. (*Ibid.*) Actual injury to the victim is not required. (*People v. Valdez* (1985) 175 Cal.App.3d 103, 113.) "[A]ssault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams*, *supra*, 26 Cal.4th at p. 790.)

Substantial evidence supports the juvenile court's finding that appellant assaulted Pope. As appellant acknowledges, Ardemagni testified she saw appellant hitting and kicking Pope in the back and chest when he was on the ground. Contrary to appellant's suggestion, the absence of any serious injury to those particular areas of Pope's body does not preclude a finding appellant committed an assault. The juvenile court could reasonably conclude that appellant's act of hitting and kicking Pope in the upper body, during a group beating, was an intentional act that was likely to result in great bodily injury and therefore find he personally committed an assault on Pope.

11

### D. Substantial Evidence of Second Degree Robbery

Appellant contends insufficient evidence supports the court's finding that he committed second degree robbery under count 2. Relying primarily on evidence of inconsistencies and omissions in Ardemagni's prior police statement, appellant argues there is no substantial evidence he formed the requisite intent to steal during the assault on POPE, rather than after the assault ended. We reject appellant's argument.

"Robbery is the taking of 'personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property.' [Citation.]" (*People v. Lewis* (2008) 43 Cal.4th 415, 464.)

"To support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force. [Citation.] '[I]f the intent arose only after the use of force against the victim, the taking will at most constitute a theft.' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 34.)

Substantial evidence supports the inference that appellant formed the intent to steal during the assault on Pope. Ardemagni testified that the attack on Pope was still occurring when she saw appellant rummaging through Pope's pockets and heard someone say to get his wallet and phone. The evidence permits the reasonable inference that appellant's intent to steal Pope's personal property was concurrent with his act of force against him. Appellant's argument to the contrary is essentially a request that this court reweigh Ardemagni's credibility, which we cannot do.

### E. Sufficient Evidence to Support Great Bodily Injury Enhancement

Lastly, appellant challenges the sufficiency of the evidence supporting the great bodily injury enhancement in count 1, arguing there is no substantial evidence he personally inflicted Pope's head injuries upon which the enhancement was based. Respondent counters that the juvenile court properly found the enhancement to be true

12

under the group-beating theory posited by the prosecution below.  We agree with respondent.  We also reject appellant's claim that the injuries Pope sustained did not rise to the level of great bodily injury.

Section 12022.7, subdivision (a), requires that the confinement of "[a]ny person who personally inflicts great bodily injury on any person" be enhanced.  The "personally inflicts" language in section 12022.7 was construed in *People v. Cole* (1982) 31 Cal.3d 568 (*Cole*) to exclude liability for aiders and abettors.  In *Cole*, the defendant (during a burglary and robbery) ordered his accomplice to kill the victim and blocked the victim's escape while his accomplice repeatedly struck the victim, but defendant never himself struck the victim.  (*Id.* at p. 571.)  The defendant challenged the section 12022.7 enhancement, and *Cole* held the "personally inflicts" statutory language clearly and unambiguously required that the individual accused of inflicting great bodily injury must be "the person who directly acted to cause the injury.  The choice of the word 'personally' necessarily excludes those who may have aided or abetted the actor directly inflicting the injury."  (*Cole,* at p. 572.)

In *People v. S.C.* (1989) 213 Cal.App.3d 589 (*S.C.*), the court of appeal evaluated whether *Cole* precluded a section 12022.7 sentence enhancement when the defendant was one of numerous assailants who attacked the victim, knocked him to the ground and repeatedly hit and kicked him, causing the victim numerous significant injuries, primarily to his head.  Addressing the true finding on the section 12022.7 allegation, *S.C.* held there was substantial evidence to support the finding.  (*S.C.,* at pp. 591–595.)  Moreover, *S.C.* concluded the *Cole* analysis did not apply in the context of a "group pummeling."  (*S.C.,* at p. 594.)  "[W]hen a defendant participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered."  (*Ibid.*)

13

The holding in *S.C.* was affirmed by our Supreme Court in *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*).  The court in *Modiri* observed that nothing in the terms "personally" or "inflicts" as used in conjunction with "great bodily injury" requires the defendant to act alone in causing the victim's injuries.  (*Ibid.*)  Further, "nothing in *Cole* precludes a person from receiving enhanced sentencing treatment where he joins others in actually beating and harming the victim, and where the precise manner in which he contributes to the victim's injuries cannot be measured or ascertained."  (*Modiri*, *supra*, 31 Cal.3d at p. 495.)

Here, Ardemagni testified she saw Stevens kicking and stomping on Pope's head, the area to which his serious injuries were confined.  Based on this evidence, appellant claims he cannot be punished with the section 12022.7 enhancement because it is known that Stevens was the assailant who personally inflicted the great bodily injury on Pope.  Therefore, he argues the *S.C.* exception does not apply because the evidence shows only Stevens could have personally inflicted the injuries.

We disagree with appellant's contention that only Stevens could have caused injuries to Pope's head and face.  The juvenile court could reasonably believe it was impossible to determine who caused the injuries.  After Pope fell, appellant's group surrounded him, and Ardemagni ran out into the street, where she dialed 911 and flagged down a passing car.  The evidence thus suggests Ardemagni was not always in a position to see precisely who did what during the incident.  Moreover, in describing the blows he received to the area of his head, Pope testified it felt like "multiple people" were hitting him.  This evidence renders it difficult to determine exactly "whose foot could be traced to a particular kick [and] whose fist could be patterned to a certain blow."  (*S.C.*, *supra*, 213 Cal.App.3d at p. 594.)

The juvenile court here reasonably concluded there was "sufficient evidence to show … each minor … applied substantial force to the victim" and "the force with which

14

each individual applied either caused or contributed to the great bodily injury that was inflicted, specifically, each minor in the assault … put [Pope] in a position where the assault was completed by the group." The circumstances in this case present the type of scenario covered by the *S.C.* exception. Appellant "join[ed] others in actually beating and harming the victim," and "the precise manner in which he contribute[d] to the victim's injuries cannot be measured or ascertained." (*Modiri*, *supra*, 31 Cal.3d at p. 495.) Accordingly, the court did not err in applying the *S.C.* exception to find the great bodily injury enhancement to be true.

Finally, we reject appellant's assertion that the injuries Pope sustained to his face and head did not rise to the level of great bodily injury. Citing Justice Corrigan's concurring opinion in *People v. Cross* (2008) 45 Cal.4th 58, 73–74 (*Cross*), appellant asserts Pope's injuries did "not meet the definitions originally contemplated by the legislature when passing [section] 12022.7." In this regard, appellant complains there is no substantial evidence Pope "suffered any loss of consciousness, much less a prolonged loss of consciousness or severe concussion, nor bone fractures or protracted loss of impairment of any function of any bodily member or organ, nor did Mr. Pope require extensive suturing or suffer serious disfigurement."

However, a great bodily injury need not be one that caused the victim to suffer permanent, prolonged or protracted disfigurement, impairment, or loss of bodily function. (*People v. Escobar* (1992) 3 Cal.4th 740, 750 [great bodily injury found where rape victim suffered extensive bruises and abrasions on legs, knees and elbows, injury to neck, and soreness in vaginal area impairing ability to walk]; *Cross*, *supra*, 45 Cal.4th at p. 64 [injury "need not be so grave" as to cause victim permanent, prolonged, or protracted bodily damage]; see also *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733 [multiple abrasions, lacerations, swelling and bruising to eye and cheek]; *S.C.*, *supra*, 213

15

Cal.App.3d at pp. 592-595 [great bodily injury finding sustained where victim suffered swollen jaw, bruises to head and neck, and sore ribs].)

Here, the juvenile court found "there was great bodily injury, primarily the loss of consciousness, … established beyond a reasonable doubt by the evidence." The court's finding is supported by substantial evidence. Pope testified he lost consciousness at the time of the assault and subsequently was unable to follow the paramedics' instructions to stay awake in the ambulance. Witnesses' reports of Pope's incoherence at the scene and at the hospital were not inconsistent with his reported loss of consciousness. Following the incident, Pope was medicated for continuing head, neck, and back pain, was confined to bed for two weeks, and suffered migraines for three weeks. At the time of appellant's adjudication hearing, Pope suffered lingering anxiety and, in the scars above his eyebrows, bore visible reminders of the senseless, unprovoked assault by appellant and his companions on June 5, 2012. In light of all the evidence before it, the court could reasonably conclude Pope suffered great bodily injury within the meaning of section 12022.7, subdivision (a).

## *DISPOSITION*

The judgment is affirmed.

_____
HILL, P. J.

WE CONCUR:


_____
CORNELL, J.


_____
FRANSON, J.

16