Filed 11/26/14  P. v. Golson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br><br>VINCENT LAMONT GOLSON,<br><br>     Defendant and Appellant. | A135377<br><br>(San Mateo County<br>Super. Ct. No. SC074664) |

Defendant Vincent Lamont Golson appeals a judgment entered upon a jury verdict finding him guilty of felony false imprisonment, misdemeanor battery, and misdemeanor assault.  He contends on appeal that he did not knowingly and intelligently waive his right to counsel, that the trial court failed to inquire into juror misconduct, and that he was denied his right to confrontation when the trial court admitted hearsay statements made by one of his victims.  We shall affirm the judgment.

## I.   BACKGROUND

East Palo Alto police officer Andrea Dion responded to a report of a fight outside a house on the afternoon of January 31, 2011.  According to a 911 caller, a woman had a knife in each hand, a man was beating her and another man, and the woman was trying to defend herself.  When Dion arrived, three people, Willette Windom, Terry Malone, and Shawnta E.[1] flagged her down.  All of them were visibly upset.  A garden hose was in the

---

[1] We will refer to Shawnta E. by her first name.  We intend no disrespect.

1

driveway, with water running, and there was blood on the front door, the driveway, and the sidewalk. Officer Dion saw the handle of a knife in a puddle. There appeared to be blood on Shawnta's clothing.

Shawnta did not testify at trial, but her preliminary hearing testimony was read to the jury. Shawnta testified that defendant drove up to her house. She went out to the end of the driveway and asked him several times to leave. Defendant grabbed her in a tight hug around her neck, and she had difficulty breathing. She asked him to let her go and pushed away from him. He let her go after about a minute and a half. She ran into the house.

Shawnta testified that when she looked outside, she saw defendant on top of Malone, beating him with his hands. She went outside the house and used the water hose in an attempt to separate them. Her cousin, who was at the house, came outside, and she and Shawnta tried to pull Malone into the house, "because he was on the bottom just having a hard time." Defendant pulled Malone in the opposite direction. Shawnta testified that Malone was "[j]ust screaming and hollering. He couldn't breathe. He needed help, help basically." Shawnta went back into the house, as defendant and Malone continued to fight. She went outside again, begged defendant to get off Malone, and tried unsuccessfully to pull him off. She saw a knife handle and picked it up, but the blade was missing. Defendant left before the police came.[2]

When police found defendant about 45 minutes after the incident, they saw that he had a laceration on his left hand. Defendant told an officer an old man named LT had

---

[2] The evidence included multiple versions of the events in question. On cross-examination, defendant elicited the testimony of another officer that she interviewed a neighbor, who told her he saw defendant on top of Malone, that he saw a 12-inch knife in defendant's hand, and that defendant said Malone had stabbed him. He also elicited testimony that another neighbor told the officer he saw defendant choking Malone with a water hose, that defendant's left hand was bleeding, and that he had what appeared to be the handle of a knife in his hand. Windom testified that she saw defendant driving back and forth outside before he went to the house, that she heard defendant and Shawnta "exchanging words," and that afterward she saw defendant and another man "tangling," as the other man tried to get out from under defendant.

used mind control to make Shawnta pull out a butcher knife and try to stab him, and that someone had brought her a second knife. He also said he had punched Malone, and that Malone had not done anything before being punched.

Defendant testified on his own behalf. According to defendant, Shawnta attacked him with a knife as the two of them argued. She obtained another knife from a companion and struck defendant's left hand with a knife. Malone then approached defendant aggressively, and defendant knocked Malone down, dragged him out of the yard, and sat on Malone to keep from being hit by him.

The jury found defendant not guilty of the felony offense of assaulting Shawnta by means of force likely to produce great bodily injury (former Pen. Code,[3] § 245, subd. (a)(1), see § 245, subd. (a)(4)), but guilty of the lesser included offense of assault (§ 240) (count one); guilty of battery upon Shawnta E., a person with whom he had a dating relationship (§ 243, subd. (e)(1)) (count two); not guilty of assaulting Malone with a deadly weapon (§ 245, subd. (a)(1)), but guilty of the lesser included offense of assault (§ 240) (count three); and guilty of felony false imprisonment of Malone (§ 236) (count four). It also found true various prior conviction and prison term allegations. The trial court imposed a sentence of 900 days for count four and a concurrent one-year term for count two, with credit for 900 days of time served, stayed sentences on counts one and three, and stayed sentence on the prison priors in the interest of justice.

## II. DISCUSSION

### A. Self-Representation

Before trial, defendant sought to dismiss his counsel and represent himself, and the trial court held a hearing pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to determine whether his waiver of his right to counsel was knowing and intelligent. After a colloquy with defendant, the trial court granted his request and defendant acted as his own attorney at trial. Defendant contends his waiver of his right to counsel was invalid because the trial court did not advise him of the nature of the charges against him.

---

[3] All undesignated statutory references are to the Penal Code.

3

"A defendant in a criminal proceeding has a federal constitutional right to counsel, which may be waived if the defendant wishes to represent himself at trial. (*Faretta* [*supra*, 422 U.S. at p.] 835.) Because a waiver of the right to counsel relinquishes many of the benefits associated with that right, a knowing and intelligent waiver of the right to counsel is required before a criminal defendant is permitted to represent himself. (*Ibid*.) *Faretta* instructed that the defendant should be made aware of the dangers and disadvantages of self-representation; the record must establish that ' "he knows what he is doing and his choice is made with eyes open." ' (*Ibid*.) Our own Supreme Court instructs that '[t]he test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case.' [Citation.]" (*People v. Conners* (2008) 168 Cal.App.4th 443, 454 (*Conners*).) A trial court should ensure that the defendant understands the nature of the charges against him, the possible penalties, and the dangers and disadvantages of representing himself. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 545 (*Sullivan*); see also *Iowa v. Tovar* (2004) 541 U.S. 77, 81.) However, "[t]he failure to give a particular set of advisements does not, of itself, show that a *Faretta* waiver was inadequate. Instead, '[t]he burden is on appellant to demonstrate that he did not intelligently and knowingly waive his right to counsel. . . . [T]his burden is not satisfied by simply pointing out that certain advisements were not given.' [Citation.]" (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1058 (*Weber*).)

On appeal, we review the entire record and determine independently whether the defendant's waiver of the right to counsel was knowing, intelligent, and voluntary. (*Weber*, *supra*, 217 Cal.App.4th at p. 1058; *Conners*, *supra*, 168 Cal.App.4th at p. 454.)

During the *Faretta* hearing, the trial court discussed with defendant his prior experience in the criminal justice system, explained the role of the judge and pointed out that the court would not show defendant any favoritism if he represented himself, explained what defendant's responsibilities would be if he represented himself, emphasized the ways in which defendant would be at a disadvantage without counsel,

4

discussed defendant's possible maximum sentence of 11 years, ensured that defendant understood that the district attorney was prepared to offer him a plea bargain under which he would be convicted of two misdemeanors, and told defendant it was the court's belief it was a mistake for people to represent themselves. The court then found defendant had made a knowing, intelligent, and voluntary waiver of his right to counsel, and granted the *Faretta* motion.

Defendant contends these advisements were inadequate because the trial court did not explicitly inform him of the nature of the crimes with which he was charged, but instead referred to the crimes by their Penal Code section numbers. At the beginning of the *Faretta* hearing, the trial court noted that a prior judge had summarized the allegations, and later, in discussing the potential penalties, stated, "let's see what you're charged with, a 245, and 243(e), and another 245 and a 236," and continued to refer to the charged crimes by their section numbers. Defendant contends a layperson would not have understood from this discussion the nature of the charges against him.

We reject this contention. The record as a whole makes clear defendant understood the charges he faced. At the close of the *Faretta* hearing, defendant told the court he wished to file two motions he had prepared. One of the motions was to quash the indictment for violation of defendant's right to a speedy trial. The other was to quash the indictment as to two of the charges against him, sections 243, subdivision (e)(1) (domestic battery) and section 236 (false imprisonment) on the grounds that those two charges were not included in the original complaint, the "new complaint" (apparently referring to the information) containing those charges lacked a signature, and he had not been properly arraigned on the charges. These handwritten motions referred to the charges against him by their Penal Code section numbers. At oral argument on the motions two days later, defendant argued that the evidence presented at the preliminary hearing did not justify the new charges. He acknowledged that his former counsel had given him the information containing the new charges less than two weeks after it was filed, a date that was more than four months before the *Faretta* hearing. Defendant also

5

referred to "the 236 of false imprisonment" and discussed the charge by its section number.

In his further argument, defendant again showed his familiarity with the nature of the charges against him and the section numbers that applied to the charges. While discussing the prosecutor's motion in limine to exclude any reference to whether the charges were felonies or misdemeanors, defendant argued that the jury "need[ed] to know the seriousness and why I am being charged with these, you know. Like the 245, you got to give the definition what the 245(a)(1) is." Defendant later pointed out he had been arrested for "a 245(a), assault with a deadly weapon with the great bodily injury, a knife, that's what in the complaint," and later pointed out he had been charged with "a 245 with a knife."

Based on this record, we are satisfied that defendant was aware of the nature of the charges against him at the time the trial court granted the *Faretta* motion, and we reject his contention that his waiver of his right to counsel was not knowing and intelligent.

## B. Jury Selection

Defendant contends the trial court improperly failed to inquire into possible juror misconduct by Juror No. 11.

At the beginning of jury selection, the trial court read the information to the jury. Eighteen potential jurors were then called into the jury box. Juror No. 11 was not among them. The trial judge asked the jurors in the box if anything about the charges would prevent them from being fair and impartial. Three potential jurors mentioned a history of domestic abuse in their families, and another one mentioned that she worked with victims of domestic abuse through her job as a nurse. The judge asked if anyone had been a victim of domestic violence. The prosecutor asked if anyone had any sort of specialized legal training or work experience, and one potential juror stated that he had studied criminology and had conducted background investigations. The matter was adjourned for the weekend.

Jury selection resumed four days later. After a number of jurors had been excused, a group of potential jurors that included Juror No. 11 was called into the jury

6

box for voir dire.  The judge explained to them the role of the jury and asked if they could perform their role.  He then asked if any of them had been the victim of domestic violence, and received no response.  He asked if there was any reason any of them could not be fair and impartial.  One potential juror had worked with students who had experienced domestic violence and had a cousin who had been abused by her husband.

The trial judge then noted that he was a friend of Juror No. 11.  Juror No. 11 explained that her husband was president of a children's advocacy and research organization, and that she was at home with her three children.  During her questioning of the panel, the prosecutor asked if there was anything the jurors wished to share regarding whether they could be fair and impartial, and Juror No. 11 replied, "No."

After the jury had been sworn in, and after a short recess, the trial court stated that Juror No. 11 had written a note.  The handwritten note, a copy of which is in the record, states, "Your Honor--  [¶] It didn't come out in questioning that I'm a lawyer by training.  I don't practice—I'm home with my girls but realized maybe the Court should know."  On either a second page or the other side of the note, Juror No. 11 added, "PS.  In writing this note it flashed back that 17 years ago I was a law school volunteer in a TRO clinic.  [¶] I'm so sorry this just occurred to me."  The court said, "Now, Juror No. 11 was kind enough to write a note to us informing us that she is a lawyer by training, but you haven't practiced?"  She replied, "No, I used it as a CEO."  The court said, "Okay.  All right.  Thank you for letting us know that."  Neither the prosecutor nor defendant asked the court to inquire further into the matter.  Later, out of the presence of the jury, the court said,  "And were there any other issues that you wanted to raise, Mr. Golson[?]  [¶] So here's [Juror No. 11's] note.  You can put that with the file.  Thank you."

Defendant contends the trial court improperly failed to inform him that Juror No. 11 had worked in a temporary restraining order clinic, where, he asserts, she would have assisted victims of domestic violence.[4]  He also contends Juror No. 11's failure to

---

[4] The record does not disclose whether defendant and the prosecutor saw Juror No. 11's note.  It appears to have been delivered to the judge during a recess, and we are unable to determine whether he showed it to them.

mention her law school and clinic experience during voir dire amounted to improper concealment, and the trial court was obliged to inquire into her misconduct.  In particular, he argues, the court should have inquired further of Juror No. 11 regarding her experience with the clinic, her involvement with organizations that advocated for victims of domestic violence, and her opinions about people subject to temporary restraining orders.

"A criminal defendant has a constitutional right to an impartial jury, and the pretrial voir dire process is important because it enables the trial court and the parties to determine whether a prospective juror is unbiased and both can and will follow the law. But the voir dire process works only if jurors answer questions truthfully. 'As the United States Supreme Court has stated, "*Voir dire* examination serves to protect [a criminal defendant's right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors.  Demonstrated bias in the responses to questions on voir dire may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges.  The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." [Citation.]  [¶] A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct.' [Citation.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 822–823; see also *People v. Castaldia* (1959) 51 Cal.2d 569.)

"When misconduct involves the concealment of material information that may call into question the impartiality of the juror, we consider the actual bias test of *People v. Jackson* (1985) 168 Cal.App.3d 700, 705, adopted by [the Supreme Court] in *People v. McPeters* (1992) 2 Cal.4th 1148, 1175 [superseded by statute on another point as stated in *People v. Wallace* (2008) 44 Cal.4th 1032, 1087].  'Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect.  "[T]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is

8

unable to perform his duty." (*People v. Jackson* [*supra,* 168 Cal.App.3d at p.] 706.)  [¶] Whether a failure to disclose is intentional or unintentional and whether a juror is biased in this regard are matters within the discretion of the trial court.  Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination. [Citations.]' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644 [new trial motion].)  As our high court has explained, " ' "[N]ot every incident involving a juror's conduct requires or warrants further investigation.  'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror— rests within the sound discretion of the court.' " ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 506.)[5]

We see no abuse of discretion in the trial court's failure to make a closer inquiry after receiving the note.  Juror No. 11 was asked, along with the other jurors, whether she had been the victim of any type of domestic violence.  Like the other jurors, she was asked if there was any reason that she could not be fair and impartial, and she responded in the negative.  She was never asked whether she had legal training or whether she had worked with victims of domestic violence.  Her note indicates that her law school experience and her volunteer work 17 years previously was not in her mind during voir dire.  On this record, the trial court could reasonably conclude Juror No. 11 had not committed misconduct and that there was no need for further investigation.

### C. Admission of Hearsay

Defendant contends the admission of hearsay statements made by Malone violated his rights under the confrontation clause.  "The Sixth Amendment of the federal Constitution provides that a defendant has the right to confront the witnesses against him. In *Crawford* [*v. Washington* (2004) 541 U.S. 36 (*Crawford*)], the United States Supreme

---

[5] The obligation to investigate rests with the trial court whether or not the defendant requests an inquiry, and a defendant does not forfeit a claim that the inquiry was inadequate by failing to raise the issue at trial. (*People v. Cowan*, *supra*, 50 Cal.4th at p. 506.)

Court held that admission of a 'testimonial' hearsay statement by a declarant who does not appear for cross-examination at trial violates the confrontation clause unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine the witness. [Citation.] This rule applies even if the statement is otherwise admissible under a hearsay exception. [Citation.] However, the confrontation clause does not bar admission of hearsay statements that are not testimonial. [Citation.]" (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1463.)

The United States Supreme Court has explained that the confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' [Citation.] 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' [Citation.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Crawford*, *supra*, 541 U.S. at p. 51.) Discussing this rule further, our Supreme Court has explained: "[T]he confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence

10

about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fns. omitted.)

Defendant does not point to any hearsay statements made by Malone that were admitted into evidence. He has therefore failed to meet his burden to show error. (See *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517 [appellate court presumes decision of trial court is correct; error must be affirmatively shown].)

In any case, the Attorney General points out that the jury heard only one statement made by Malone, when Shawnta testified that Malone was "[j]ust screaming and hollering. He couldn't breathe. He needed help, help basically."[6] Assuming Shawnta was quoting Malone's words, nothing suggests his statements were testimonial under the legal standards discussed above. Rather, they appear to fall within the hearsay exception for spontaneous statements. (See Evid. Code, § 1240.)[7] As noted in *People v. Pedroza* (2007) 147 Cal.App.4th 784, 794, " 'statements made without reflection or deliberation are not made in contemplation of their "testimonial" use in a future trial,' " and their admission does not violate the Sixth Amendment right to confrontation.

We have no hesitation in concluding Malone's statement was not testimonial, and, accordingly, we reject defendant's contention that his rights under the confrontation clause were violated.

### III.    DISPOSITION

The judgment is affirmed.

---

[6] After briefing in this case was complete, we granted leave for defendant to file a supplemental opening brief raising this argument, and set a briefing schedule for supplemental respondent's and reply briefs. In her supplemental respondent's brief, the Attorney General pointed out that this was the only out-of-court statement of Malone that was admitted into evidence. Defendant did not file a supplemental reply brief.

[7] Evidence Code section 1240 provides that the hearsay rule does not bar a statement that "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.