Filed 5/1/26  P. v. Hernandez CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDREW MICHAEL HERNANDEZ,<br><br>Defendant and Appellant. | F088049<br><br>(Super. Ct. No. VCF406132A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Brad Kaiserman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench, Dina Petrushenko and Rosanne Rust, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted defendant Andrew Michael Hernandez of first degree murder, and found true a special allegation that he was armed with a firearm in the commission of that crime and certain aggravating factors.  The trial court sentenced defendant to 25 years to life in prison plus one year for his possession of a firearm during the crime.

On appeal, defendant argues that insufficient evidence supported the jury's verdict and the trial court erred in failing to dismiss the one-year firearm enhancement. Defendant further argues that if this court finds his argument regarding the one-year enhancement was forfeited, then he received ineffective assistance of counsel before the trial court. We affirm.

## PROCEDURAL SUMMARY

On April 2, 2024, the Tulare County District Attorney filed a first amended information, charging defendant and codefendant Curtis Elmo Williams, Jr., with the murder of Brandon McCarron (Pen. Code,[1] § 187, subd. (a); count 1). The first amended information further alleged as to defendant that a principal was armed with a firearm (§ 12022, subd. (a)(1)) and defendant personally used a firearm (§§ 12022.53, subd. (b), 12022.5, subd. (a)) in the commission of count 1. The following circumstances in aggravation were also alleged as to defendant: the offense involved great violence or great bodily harm (Cal. Rules of Court, rule 4.421(a)(1))[2] and defendant was armed with or used a weapon at the time of the commission of the crime (rule 4.421(a)(2)).

On April 23, 2024, the jury returned verdicts finding defendant guilty of murder in the first degree and the special allegation true that, in the commission of the crime, a principal was armed with a firearm. The jury also found true both aggravating factors. The jury found the allegations not true that defendant personally used a firearm.

On May 14, 2024, the trial court sentenced defendant to 25 years to life on count 1, plus one year pursuant to section 12022, subdivision (a).

Defendant filed a notice of appeal on May 14, 2024.

---

[1]     All further statutory references are to the Penal Code.

[2]     All further rule references are to the California Rules of Court.

## FACTUAL SUMMARY

### *The Party at Defendant's Apartment*

On the evening of Friday, November 27, 2020, defendant hosted a party at his first-floor apartment located in a complex in Visalia. Attendees included Williams and McCarron and mutual friends of Williams and defendant. Defendant knew Williams through one of their mutual friends and had attended a party on a prior occasion with him in Tulare. Defendant had a contact for Williams in his cell phone that he created on November 24, 2020, under the name "Mozzy," which defendant understood to be Williams's nickname. Defendant and McCarron were friends and neighbors in the apartment complex. McCarron's apartment was upstairs in a nearby building, about 45 feet from defendant's apartment.

Williams arrived at the party with his girlfriend and his seven- or eight-year-old son. Williams testified that he brought a nine-millimeter handgun with him for his protection. Sometime after arriving at the party, Williams gave defendant the handgun for safekeeping. Defendant placed the gun on the top shelf of his bedroom closet.

Williams met McCarron for the first time at the party. He said that, when he and McCarron first met, they "were cool." Defendant, McCarron, and Williams consumed alcohol and drugs. By approximately 12:30 a.m. the next morning, the other attendees, including Williams's girlfriend and his child, had left, and a friend of defendant's had gone to sleep in a bedroom in defendant's apartment, leaving only defendant, Williams, and McCarron still engaged in the party. Later, they decided to move the party to McCarron's apartment.

After a while, Williams and McCarron left the apartment to try to procure additional drugs. Defendant did not join them. Upon their return, McCarron notified defendant and the three of them continued to consume alcohol and drugs.

### *Scheduling of an Exotic Dancer*

At some point after Williams and McCarron returned, McCarron said that he wanted to order an exotic dancer to perform in his apartment. Defendant said that he did not want to be involved because he did not pay for women and he loved his fiancée; therefore, he left the party before the dancer arrived. Surveillance video footage confirmed that defendant left McCarron's apartment at approximately 5:20 a.m., walked down the adjoining stairs and towards his apartment. Defendant appeared to be wearing a dark colored shirt with a logo on the left breast area, another logo on the back, dark colored shorts, dark socks, and dark colored shoes. Defendant did not have his hands in his pockets or tucked into his waist.

Shortly thereafter, the dancer's driver walked up the stairs to McCarron's apartment to collect the fee for the performance. Soon thereafter, the dancer arrived, met the driver briefly at the bottom of the stairs, and then walked up with him to McCarron's apartment. At 5:31 a.m., the driver walked down the stairs from McCarron's apartment towards the parking lot and got into his car.

The dancer testified that upon arriving at the apartment she saw two men, whom she identified as the person who booked her performance and a "black guy." During the police investigation, the dancer identified Williams as the "black guy" she saw in the apartment. Soon after arriving, she went into the bathroom to change into the clothing she would wear during her performance.

### *The Shooting and Its Aftermath*

When the dancer came out of the bathroom to begin her performance, Williams said to her: "If [she] wasn't going to fuck," "[t]hen he want[ed] his money back." She testified that Williams's demeanor was different when she exited the bathroom, and that he was "rude" to her. She declined his request and said she would refund the money. McCarron countered that it was fine for her to just dance. He also apologized to her for

4.

the way Williams was acting and said that he had just met him. Believing she would not be performing, the dancer called her driver to come back to the apartment to refund the money.

As McCarron and Williams continued to argue with raised voices about whether the dancer would be allowed to perform, defendant "burst into the door." Surveillance video footage of defendant going to McCarron's apartment just before this moment showed him walking towards the stairs with his right hand in the area of his waist and taking some of the stairs two at a time. Williams approached defendant and asked, "where's my gun." Defendant pulled the gun from the front of his pants and gave it to Williams.

Once he had the gun in his hand, Williams hit McCarron with it. It did not appear to the dancer that McCarron was fighting back. Seeing this, the dancer went into the kitchen. While there, she heard a single gunshot, which caused her to flee the apartment. As she left, she saw McCarron fall to the couch on his back. She testified that, at some point before she left the apartment, she saw a gun on a table that looked like the same gun that Williams had used to strike McCarron. She thought that when she saw the gun on the table, defendant had already left the apartment. However, on cross-examination, she admitted that she did not recall exactly when defendant left the apartment. Surveillance footage showed that defendant exited the apartment and went down the stairs with the dancer following soon thereafter at approximately 5:35 a.m. Defendant appeared to be wearing the same shirt and shorts as he had worn earlier when he exited McCarron's apartment. Defendant appeared to be holding his right hand in the area of his waist. The surveillance footage showed defendant moving down the stairs more quickly than when he left the apartment earlier, before the dancer arrived, but showed that once he got to the bottom of the stairs, he was walking rather than jogging or running, in the direction of his apartment.

5.

***Defendant's Accounts of the Shooting***

Defendant gave different accounts of the evening in his interviews with police, eventually explaining that he left the party before the dancer arrived and went back to his apartment. While there, he heard what he thought was "fighting" between Williams and McCarron and that they were "yelling at each other" so defendant "ran up there." When he arrived, he saw that the dancer "looked scared" and that Williams and McCarron were "swinging on each other" and the "next thing [he] kn[e]w, [he] heard gunshots. [He] just got out of there."

At trial, defendant denied hearing an argument between Williams and McCarron and testified that the reason he went back to McCarron's apartment was in response to a text message from Williams requesting that his gun be brought to him, though a subsequent search of defendant's cell phone and phone records showed no evidence of such a text message. When asked on cross-examination how Williams knew his cell phone number to text him, defendant testified that "when we were at my apartment, we all exchanged phone numbers."

In response to Williams's text message, defendant testified that he retrieved the gun and took it to McCarron's apartment. Defendant admitted that in walking up to McCarron's apartment, he was "moving kind of quick" but denied that he had any reason to be in a hurry and was "[s]imply returning [Williams's] property to him." Defendant confirmed that when he was walking up the stairs, he was holding the gun in his waistband.

When he arrived in the apartment, defendant testified there was no fighting between Williams and McCarron. When Williams asked where his gun was, defendant said that he took the gun out of his waistband and handed it to Williams. Defendant said McCarron then asked Williams what he was going to do with the gun and Williams said, "nothing. [He] just want[ed] [his] money back. [¶] And at that point, [McCarron] struck

6.

Williams and [Williams] kind of stumbled a little bit, and that's when [defendant] heard the gunshot." On cross-examination, defendant further described this moment as follows: "So when he stumbled back, he put one foot behind him. I just know that he was at an angle. And after he stumbled back, his hand comes up and the gun goes off."

Defendant confirmed he saw Williams strike McCarron with the gun but thought that happened after the gun fired. Williams testified that after receiving the gun from defendant, he tried to put it in his pocket, but as he was doing so, McCarron struck him and in the ensuing struggle, the gun fired. On cross-examination, defendant agreed that he had brought a gun to what, at most, would have otherwise been a fist fight.

At that point, defendant said he was "in shock" and he left the apartment. Defendant denied that he was carrying anything with him. On cross-examination, the prosecutor showed defendant a video recording of him walking down the stairs with his right hand at his waist. Defendant confirmed he was holding his waistband in the same way as when he walked up the stairs but denied he was carrying the gun on the way out of the apartment and suggested that the reason he was holding his waistband was "[m]aybe to keep [his] pants up."

Defendant confirmed that despite being "shocked" by what he had seen in the apartment and claiming he was in a hurry to leave, it did not appear in the video footage that he was in a hurry when leaving the apartment and moving down the stairs. Further, defendant agreed that once he got to the bottom of the stairs he was just walking, not running or jogging.

After Williams exited the apartment, he met defendant at his apartment downstairs, and defendant agreed to give him a ride home. On the way to Williams's house, defendant testified that he saw Williams with the gun. Williams testified that he disposed of the gun in a "trash can somewhere." During the car ride home, defendant

7.

told police that Williams said to him that Williams "took care of [McCarron]" and defendant should "[k]eep [his] fuckin' mouth shut."

After dropping Williams off at home, defendant returned to McCarron's apartment with a friend and confirmed that McCarron had been shot in the chest. The friend testified that she had come back to the apartments to find drugs. Video footage showed the friend going up to the apartment first at approximately 6:08 a.m., her boyfriend waiting downstairs, and defendant climbing the stairs moments thereafter. Less than a minute later, defendant descended the stairs and, after reaching the bottom of the stairs and walking several steps in the direction of his apartment, he appeared to continue at a jogging pace. His female friend exited the apartment at approximately 6:10 a.m.

Neither defendant nor Williams rendered aid to McCarron, nor did they notify the police of the shooting.

After leaving McCarron's apartment, defendant realized he did not have his cell phone. The friends who went with him to McCarron's apartment told defendant that Williams had defendant's phone. These friends told defendant to drive a nearby gas station where they and defendant were to meet Williams and his girlfriend. Defendant was accompanied by the friend who had been sleeping in a bedroom at his apartment. Once he got his phone back, the group "discussed what had happened" and "decided what to do next." Defendant claimed the friends who had attended the party and told him that Williams had his phone, told defendant "to just stay quiet and act like nothing happened" and to "leave town and lay low."[3] Someone in the group came up with a plan for Williams to leave town as well.

Defendant testified that he next went to his sister's house to eat breakfast. Thereafter, defendant and his friend drove west to Harris Ranch. On cross-examination,

---

[3] During cross-examination, defendant testified it was Williams who told him to "stay quiet."

8.

defendant agreed that he had probably left town with his friend to drive west before having breakfast with his sister.

After leaving Harris Ranch, defendant "jumped on the freeway and even headed to the coast." Claiming that he realized leaving town made him look guilty, he decided to go back to town, and eventually turned himself in on December 2, 2020. Under cross-examination, defendant admitted he had not told police about taking this drive and denied that he had the taken this drive for the purpose of disposing of the gun used in the shooting that killed McCarron.

McCarron's body was discovered by law enforcement on Monday, November 30, 2020, and an investigation began to determine his cause of death. An identification technician testified that based on the amount and location of gun residue found on McCarron's clothing, the barrel of the gun was "very close" to McCarron's chest when it fired.

Williams was captured and taken into custody following a police chase on February 9, 2021.

## DISCUSSION

Defendant challenges the judgment of conviction on two grounds. First, he argues that insufficient evidence was presented to support the murder conviction such that it should be reversed. Alternatively, defendant argues there was insufficient evidence of deliberation and premeditation such that the conviction should be reduced to second degree murder. Second, he claims the firearm enhancement must be dismissed because imposition of the enhancement resulted in a sentence of greater than 20 years.

## I. Sufficiency of the Evidence

### A. *Standard of Review*

In assessing a challenge to the sufficiency of the evidence to support a criminal conviction, " 'the reviewing court's role is a limited one.' " (*People v. Alvarez* (2025)

18 Cal.5th 387, 470.) The test is whether, viewing the entire record in the light most favorable to the judgment, it contains substantial evidence from which a rational finder of fact could make the necessary findings beyond a reasonable doubt. (*Ibid*.) The evidence must be " 'reasonable, credible, and of solid value.' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396, overruled on other grounds in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.) Unless the testimony of a single witness is physically impossible or inherently improbable, it is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The reviewing court does not reweigh the evidence or reconsider witness credibility determinations previously made by the trier of fact. (*People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.) It is the jury, not the reviewing court, that must be convinced of the defendant's guilt. (*People v. Jones* (2013) 57 Cal.4th 899, 961.) A reviewing court cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) Before setting aside the judgment of the trial court for insufficiency of the evidence, it must clearly appear there was no hypothesis whatever upon which there was substantial evidence to support the verdict. (*People v. Conners* (2008) 168 Cal.App.4th 443, 453; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

### B. Applicable Law

#### 1. Murder

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).)

Murder committed willfully with deliberation and premeditation is first degree murder. (§ 189, subd. (a).) " 'A verdict of deliberate and premeditated first degree

murder requires more than a showing of intent to kill…. "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance…. "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

### 2. Aider and Abettor Liability for Murder

Aiding and abetting liability requires a specific intent. (*People v. Hardy* (2018) 5 Cal.5th 56, 96.) " 'A person aids and abets the commission of a crime when he, 1. with knowledge of the unlawful purpose of the perpetrator; and 2. with the intent or purpose of committing or encouraging or facilitating the commission of a crime; and 3. by act or advice aids, promotes, encourages, or instigates the commission of the crime.' " (*Ibid.*, italics omitted; see CALCRIM No. 401.) A person may be liable for first degree murder as the actual killer or as an aider and abettor. (§ 189, subd. (e); *In re Lopez* (2023) 14 Cal.5th 562, 579–580.) An aider and abettor who, with knowledge of the perpetrator's intent to kill a person, intentionally assists the perpetrator to kill that person acts with the intent required to be found guilty of first degree murder. (*In re Lopez*, at p. 579.)

Among the factors which may be considered in making the determination of whether the aider and abettor knew of the intent of the direct perpetrator are: (i) presence at the scene of the crime, (ii) companionship, and (iii) conduct before and after the offense. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) Motive to kill, while probative of why the killing occurred, is not itself an element of a criminal offense. (See CALJIC No. 2.51, CALCRIM No. 370; see also *People v. Daly* (1992) 8 Cal.App.4th 47, 59.) Intent to kill can be inferred from the defendant's acts and the circumstances of the crime, as there is rarely direct evidence of a defendant's intent. (*People v. Smith* (2005)

11.

37 Cal.4th 733, 741; *People v. Lee* (1987) 43 Cal.3d 666, 679; *People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

### C. The Evidence is Sufficient to Sustain Defendant's First Degree Murder Conviction

A rational finder of fact could have found each of the elements of first degree murder proven beyond a reasonable doubt based on the substantial evidence presented at trial. First, at the time of the killing, defendant and Williams had an existing relationship with one another. They met before the killing at a party in Tulare and defendant had Williams's telephone phone number under his nickname "Mozzy" in his cell phone days before the night of the party. Their relationship was solid enough that Williams was comfortable turning his gun over to defendant for safekeeping for the duration of the party and defendant was willing to take possession and responsibility for that firearm.

Second, in the critical period immediately preceding the shooting, defendant knew that Williams and McCarron were fighting and yelling at one another. The nature of that fight was serious and caused defendant to quickly travel from his apartment to McCarron's, taking some of the stair steps two at a time, *but not before retrieving Williams's handgun* from the top shelf of his closet. When he entered McCarron's apartment, he "exploded" through the front door, indicating extreme urgency. Once inside, he saw that Williams and McCarron were fighting and the dancer was scared. From this the jury could infer that the nature of the fight was very serious.

Next, upon Williams's request, defendant handed the gun to him and Williams proceeded to hit McCarron with the gun and then fired a single shot at close range into his chest, causing McCarron to fall backwards onto the couch. After seeing his friend and neighbor killed in front of him, defendant walked out of the apartment, went down the stairs, and towards his apartment, with his right hand in his waist as he did when he went to the apartment while carrying the firearm in his waistband. In contrast to the

12.

dancer, who the jury could see left McCarron's apartment running away in only her undergarments, defendant walked, rather than ran, from the scene. The jury could reasonably infer from this that defendant had expected what had occurred in the apartment—McCarron getting shot—and had not been shocked by it.

Moreover, the jury could see that as defendant left the apartment following the shooting, he had his hand at his waist, as he had when he went up to the apartment with the gun admittedly in his possession. At the same time, the dancer testified that she thought she saw the gun used to kill McCarron on a table in the apartment after defendant had left the apartment, though she later admitted she was not certain when exactly defendant departed. Despite the conflict in the evidence, the jury could reasonably have concluded that defendant carried the weapon away from the scene of the killing, indicating that he had worked in concert with Williams in the execution of the killing and then sought to conceal the existence of the weapon.

Defendant then gave Williams a ride home, away from the scene of the crime, from which the jury could find was further evidence of defendant's companionship with and assistance in Williams's execution and coverup of the crime. Defendant next went back to his apartment complex and visited McCarron's apartment with Williams's mutual friends. Defendant testified that his purpose was to check on McCarron, while his friend searched the apartment for drugs to steal. The jury could have doubted defendant's proffered reason for going back to McCarron's apartment, especially because he never attempted to render aid to McCarron or report the shooting to law enforcement.

Shortly thereafter, defendant and Williams met again for defendant to retrieve his cell phone and to "decide what to do next," which included defendant being told by Williams to stay quiet and both defendant and Williams leaving town. Defendant left town driving west and for a time "to the coast." This activity further supports the

13.

conclusion that defendant was aware of his responsibility for the killing and was taking steps to conceal his involvement.

Taken together this evidence could reasonably have supported the jury's findings beyond a reasonable doubt that defendant knew that (1) Williams was in a serious fight with McCarron, (2) Williams requested his gun because he wanted to use it in that fight, (3) Williams's purpose in using a gun in the fight was to fire it at his opponent, McCarron, (4) given the close quarters involved if Williams fired the gun, McCarron would likely be killed, and (5) by choosing to deliver the gun to Williams under these circumstances, defendant intended to aid Williams in killing McCarron. These findings supported the jury's verdict that defendant aided and abetted Williams's murder of McCarron.

In addition, the evidence was sufficient to support findings that defendant acted with deliberation and premeditation in his actions. Delivering the gun to Williams required defendant to first decide to retrieve the gun from his closet and take it to McCarron's apartment. In making this decision, the jury could have reasonably found that defendant considered whether to comply with Williams's request, take an alternative action (such as going to McCarron's apartment without the gun), or take no action. The weighing of these options was evidence of defendant's deliberation and premeditation and was sufficient to support defendant's conviction for first degree murder.

Having found that sufficient evidence supported the conviction for first degree murder, we need not reach defendant's alternative claim that at most he should have been convicted of second degree murder.

## II. The Firearm Enhancement

### A. *Defendant Forfeited His Claim That the Trial Court Erred by Not Dismissing the One-Year Enhancement for Possession of a Firearm*

Defendant argues that the trial court erred by not striking the one-year enhancement imposed as part of his sentence. However, as defendant concedes in his

opening brief, he did not raise the issue in the trial court. His failure to do so forfeited this argument on appeal. (*People v. Torres* (2025) 113 Cal.App.5th 88, 92 (*Torres*); *People v. Carmony* (2004) 33 Cal.4th 367, 375–376; *People v. Scott* (1994) 9 Cal.4th 331, 351–354 (*Scott*)[4].)

Even if defendant had preserved the argument for appeal, we would reject the argument for the reasons stated by our colleagues in the Third District Court of Appeal in *Torres*, which we quote here:

> "Whether subdivision (c)(2)(C) of section 1385 applies where the base term of the sentence imposed already exceeds 20 years is a question of statutory interpretation that we review de novo. (*People v. Burke* (2023) 89 Cal.App.5th 237, 242 ….) ' "To resolve whether defendant's interpretation of the … statute[] is correct, we are guided by familiar canons of statutory construction. '[I]n construing a statute, a court [must] ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining that intent, we first examine the words of the respective statutes: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" ' [Citation.] If, however, the terms of a statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] 'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' [Citation.]

> "We conclude that defendant's interpretation is at odds with the clear text of the statute. To reiterate, subdivision (c)(2)(C) of section 1385

---

[4] Defendant argues that "a claim regarding an unauthorized sentence cannot be forfeited" and cites *Scott*. Defendant's reliance on *Scott* is misplaced. In that case, the Supreme Court made clear that the " 'unauthorized sentence' concept constitutes a narrow exception" to the forfeiture doctrine and that "a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*Scott, supra*, 9 Cal.4th at p. 354.) For the reasons we address below, the enhancement was lawfully imposed in this case.

15.

provides in relevant part, 'The application of an enhancement could result in a sentence of over 20 years.' A sentence exceeding 20 years could *result* from an enhancement where a sentence of that length arises as a consequence of the enhancement. (See Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 1063, col. 1 [defining 'result'].) Thus, the effect of applying the enhancement itself leads to a sentence exceeding 20 years. The word result denotes a causal relationship between the enhancement and a sentence exceeding 20 years. Accordingly, this subdivision concerns 'enhancements increasing [a] sentence above 20 years.' (*People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1097, fn. 6 .…) In this instance, the sentence already exceeded 20 years without any enhancement, so application of the firearm enhancement did not result in the effect addressed by this provision. We conclude from the plain language of section 1385, subdivision (c)(2)(C) that this provision does not apply where the enhancement itself does not 'result' in a sentence exceeding 20 years." (*Torres*, *supra*, 113 Cal.App.5th at p. 93.)

Defendant argues that *Torres* was wrongly decided. We disagree.

Here, defendant was sentenced to a base term of 25 years to life for first degree murder. As defendant had already been sentenced to more than 20 years in prison, the addition of the one-year firearm enhancement did not result in a sentence of more than 20 years. Like the sentence at issue in *Torres*, section 1385, subdivision (c)(2)(C) does not apply, let alone mandate, dismissal of the enhancement in this case.[5]

### B. Defendant's Ineffective Assistance of Counsel Claim Fails

Defendant argues that, if he forfeited the argument that the trial court erred by not dismissing the enhancement, he received ineffective assistance of counsel. We disagree.

A defendant asserting a claim of ineffective assistance of counsel has the burden of showing both that (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudice, that is, but for counsel's unprofessional error a different

---

[5] Because we find that section 1385, subdivision (c)(2)(C) does not apply to defendant's case, we do not reach his argument that the "shall be dismissed" language should be interpreted to mandate dismissal of the enhancement in cases where the defendant is sentenced to an indeterminate term because the defendant will not be paroled in the absence of a finding that their release will not endanger public safety.

16.

result would have been reasonably probable.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687−688, 691–692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216.)

As explained above, section 1385, subdivision (c)(2)(C) did not mandate the dismissal of the firearm enhancement in this case.  The claim to the contrary is without merit.  "Failure to raise a meritless objection is not ineffective assistance of counsel." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90.)  An invitation by defense counsel to the sentencing court to dismiss an enhancement based on section 1385, subdivision (c)(2)(C) would have been properly declined.

## **DISPOSITION**

The judgment is affirmed.


DESANTOS, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.


17.